**HMH PUBLISHING CO., INC.**, a Dela-
ware corporation, and **Playboy Clubs
International, Inc.**, a Delaware corpora-
tion, Appellees,

v.

**Victor BRINCAT, Appellant.**

No. 72-1728.

United States Court of Appeals,
Ninth Circuit.

Aug. 15, 1974.

As Modified on Denial of Rehearing
Nov. 20, 1974.

Timothy J. Ward (argued), Burlingame, Cal., for appellant.

Michael L. Shakman (argued), of Devoe, Shadur, Plotkin, Krupp & Miller, Chicago, Ill., for appellees.

## OPINION

Before BROWNING and SNEED, Circuit Judges, and SHARP,* District Judge.

SNEED, Circuit Judge.

The present appeal attacks a judgment entered by the United States District Court for the Northern District of California in which it was held that appellant's use of the terms "Playboy" and "Bunny" in conjunction with his various businesses constituted trademark infringement and unfair competition.[1]

---

* Honorable Morell E. Sharp, District Judge, Western District of Washington, sitting by designation.

1. HMH Publishing Co., Inc. v. Brincat, 342 F.Supp. 1275 (N.D.Cal.1972).

HMH Publishing Co., Inc. and Playboy Clubs International, Inc., a wholly owned subsidiary (hereinafter referred to collectively as HMH), are Delaware corporations with their offices and principal places of business in Chicago, Illinois. Victor Brincat, an individual, is a resident of the State of California. Jurisdiction of the district court was founded upon 28 U.S.C. §§ 1338 and 1332.

HMH Publishing Co., Inc. is the publisher of *Playboy* magazine and the owner of federal trademark registrations for the marks "Playboy" and "Bunny" as trade and service marks.[2] In addition to its publishing business, HMH has, directly or through subsidiary and related companies, engaged in a wide variety of other business activities under the mark "Playboy."[3] Playboy Clubs International, Inc., under a controlled license from HMH, franchises others to use the marks of HMH in such areas as the operation of nightclubs, hotels, and resort-hotels.[4]

Since 1967, appellant has operated five unincorporated businesses in or near San Mateo, California under the name Playboy.[5] These businesses have marketed a variety of automotive products and services including dune buggies (four-wheel sports vehicles which are usally constructed from Volkswagen frame and drive components with a fiberglass body), dune buggy bodies and accessories, automobile upholstery, automobile body repairs and service, and automobile towing.

The trial court found that prior to appellant's first use of the term "Playboy" in 1967, HMH had been publicly associated with automotive products, and especially with sports and pleasure vehicles. In reaching this conclusion, the court evaluated not only evidence of advertising by HMH of its own marks prior to 1967, but also evidence of extensive automotive advertising which *Playboy* magazine had carried and its publication of numerous articles about automobiles and their related goods. In addition, the court gave weight to the fact that many major manufacturers regarded an association with *Playboy* as a viable means of marketing their products.

Having found that the mark "Playboy" had become associated in the public mind with automobiles and automotive products, and having found that appellant adopted the name "Playboy" with the intent of trading upon HMH's goodwill,[6] the court enjoined appellant's

---

2. For additional background information regarding HMH's activities in California, *see* HMH Publishing Co., Inc. v. Lambert, 482 F.2d 595 (9th Cir., 1973); HMH Publishing Co., Inc. v. Brincat, *supra*; HMH Publishing Co., Inc. v. Hale, 156 F.Supp. 594 (N.D.Cal., 1957). *See generally,* Turner v. HMH Publishing Co., Inc., 380 F.2d 224 (5th Cir.), cert. denied, 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967); HMH Publishing Co., Inc. v. Turbyfill, 330 F.Supp. 830 (N. D.Fla.1971); HMH Publishing Co., Inc. v. Playboy Records, Inc., 161 F.Supp. 540 (N. D.Ill.1958).

3. As found by the district court, these activities have included uses of the mark "Playboy" in connection with:
 . . . a model agency (first used in 1956), television program production (first used in 1960), film production (first used in 1960), book publishing division (first used prior to 1963), a products division which sells hard and soft goods (including a variety of products such as keys, key chains, wallets, jewelry and clothing)

(first used prior to 1964), a movie theatre (first used in 1964) and a limousine service (first used in 1969).
342 F.Supp. at 1277.

4. As of the date of the district court's opinion, franchised Playboy Clubs were located in fifteen cities throughout the United States as well as in Montreal, Canada and London, England. On January 1, 1965, a Playboy Club was opened in Los Angeles, California and on November 3, 1965, in San Francisco, California. Both have operated continuously since their inception. Playboy Club Motels and Hotels are operated in Jamaica, British West Indies, Lake Geneva, Wisconsin and Chicago, Illinois.

5. These five businesses were run under the names: (1) Playboy Auto Manufacturing Company; (2) Playboy Manufacturing Company; (3) Playboy Fiberglass Manufacturing Company; (4) Playboy Auto Upholstery Company; and (5) Playboy Body Shop.

6. The trial court's finding of intent was based on three gounds. First, there was ev-

use of that name in connection with his various businesses. In so doing, the court concluded that appellant had violated both the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq., and the applicable California law, Cal.Bus. and Professions Code § 14330. In addition to injunctive relief, the court awarded costs and reasonable attorneys' fees to HMH.

Trademark infringement is a peculiarly complex area of the law. Its hallmarks are doctrinal confusion, conflicting results, and judicial prolixity. The source of this difficulty is that each case involves an effort to achieve three distinct objectives which, to a degree, are in conflict. These are: (1) to protect consumers from being misled as to the enterprise, or enterprises, from which the goods or services emanate or with which they are associated; (2) to prevent an impairment of the value of the enterprise which owns the trademark; and (3) to achieve these ends in a manner consistent with the objectives of free competition. The third objective dictates a degree of restraint in the pursuit of the first two; the second can be pushed beyond the reasonable needs of the first; and each requires for its proper implementation the exercise of judicial intuition supported, to the extent possible, by relevant facts. This case is no different from its kind, and we approach it with a keen awareness of its difficulty and our peril.

## I.

HMH's fundamental contention is that appellant's use of the name "Playboy" is likely to cause confusion on the part of consumers with respect to appellee's "sponsorship" of the products and/or services offered by appellant to the public. This being so, HMH asserts that there has been a violation of the Lanham Act, and in particular the provisions of Section 32(1), 15 U.S.C. § 1114(1). As currently enacted, this section permits the owner of a registered mark to maintain a civil action against any person who, without the consent of the registrant uses:

. . . in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . .

15 U.S.C. § 1114(1).

■ Appellee's interpretation of the Lanham Act is correct. Although the Trademark Act of 1905 and, at least in the view of some courts, the 1946 version of the Lanham Act did not afford the registrant protection from sponsorship confusion, the judicial and legislative history of the post-1946 period set forth in the margin clearly indicates that a likelihood of confusion as to sponsorship may be a ground for a valid cause of action under the present Act.[7]

idence of the fact that appellant had been in Playboy Clubs and read *Playboy* magazine prior to his adoption of the term "Playboy" for his businesses. Second, there was evidence that appellant had contacted a trademark attorney in mid-1968 and had been advised against the use of the Playboy mark on his products. Third, there was evidence that in conjunction with his towing service, appellant had used the mark "Playboy" with the mark "Bunny," and that only HMH had previously used these two marks together.

7. As originally enacted, the Trademark Act of 1905, 33 Stat. 724 et seq., created a cause of action only where the infringing mark was on "[goods] of the same descriptive prop-

erties" as those marketed by the owner of the trademark. While sponsorship confusion could give rise to a cause of action under the more general theory of unfair competition, the Act afforded the owner of the mark no such protection. *See, e. g.*, Triangle Publications, Inc. v. Rohrlich, 167 F.2d 969 (2d Cir., 1948), overruled on other grounds, Monsanto Chemical Co. v. Perfect Fit Products Mfg. Co., 349 F.2d 389, 391 (2d Cir., 1965); Hanson v. Triangle Publications, Inc., 163 F.2d 74 (8th Cir.), cert. denied, 332 U.S. 855, 68 S.Ct. 387, 92 L.Ed. 424 (1948). *Cf.* Esquire, Inc. v. Maira, 101 F.Supp. 398 (M.D.Pa.1951).

With the passage of the Lanham Act of 1946, 60 Stat. 427, as amended, 15 U.S.C. §

## II.

The issue before us, therefore, is whether appellant's activities created a sufficient probability that there would be confusion as to HMH's sponsorship of his products so that HMH is properly entitled to recover under the Act. Inasmuch as the facts are not in dispute, the issue is an appropriate one for this Court to resolve. *See, e.g.* HMH Publishing Co., Inc. v. Lambert, 482 F.2d 595, 599 (9th Cir., 1973); Carter-Wallace, Inc. v. Procter & Gamble Co., 434 F.2d 794, 799 (9th Cir., 1970); Sleeper Lounge Co. v. Bell Manufacturing Co., 253 F.2d 720 (9th Cir. 1958).

■ We commence by emphasizing that the mere *possibility* that the public will be confused with respect to HMH's sponsorship of appellant's products is not enough. There must exist a likelihood that such confusion will result. *See, e.g.* Carter-Wallace, Inc. v. Procter & Gamble Co., *supra,* 434 F.2d at 804.

Next it is necessary to observe that while the existence of a likelihood of confusion is dependent upon the facts of each particular case, Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 160 (9th Cir., 1963), the courts

have selected certain factors as having special relevance to a proper resolution of this issue. These include:

. . . visual, verbal and intellective similarity; the class of goods in question; the marketing channels; the intent of defendant; evidence of actual confusion; and the strength or weakness of the marks in question.

Carter-Wallace, Inc. v. Procter & Gamble Co., *supra,* 434 F.2d at 800. *See also* K-S-H Plastics, Inc. v. Carolite, Inc., 408 F.2d 54, 57 (9th Cir.), cert. denied 396 U.S. 825, 90 S.Ct. 69, 24 L.Ed.2d 76 (1969); Paul Sachs Originals Co. v. Sachs, 325 F.2d 212, 214 (9th Cir., 1963); Sleeper Lounge Co. v. Bell Manufacturing Co., *supra,* 253 F.2d at 722-723; G. D. Searle & Co. v. MDX Purity Pharmacies, Inc., 275 F.Supp. 524, 530 (C.D.Cal.1967).

■ Turning to the last-mentioned of these factors, the strength or weakness of the mark in question, we believe that, contrary to the strong assertions of HMH, the term "playboy" as applied to HMH's products is neither fanciful nor arbitrary. *Compare* Polaroid Corp. v. Polaraid, Inc., 319 F.2d 830 (7th Cir., 1963); Sunbeam Lighting Co. v. Sun-

1051 et seq. Congress shifted the standard to encompass activities which were "likely to cause confusion or mistake or to deceive purchasers as to the source or origin of such goods or services," c. 540, Title VI, § 32, 60 Stat. 437. Thus, an infringement could be found and prohibited under federal law even though goods of different descriptive properties were involved and though, in consequence, the parties were not in direct competition. *See, e. g.,* Sears, Roebuck & Co. v. Johnson, 219 F.2d 590 (3d Cir., 1955); Pure Foods, Inc. v. Minute Maid Corp., 214 F.2d 792 (5th Cir., 1954); Admiral Corp. v. Penco, Inc., 203 F.2d 517 (2d Cir., 1953), overruled on other grounds, Monsanto Chemical Co. v. Perfect Fit Products Mfg. Co., *supra.*

Although a number of courts apparently adopted the view that sponsorship confusion was outside the ambit of the Act, *see, e. g.* Time, Inc. v. Life Television Corp., 123 F. Supp. 470, 478 n. 10 (D.Minn.1954); Conde Nast Publications, Inc. v. Vogue School of Fashion Modelling, Inc., 105 F.Supp. 325 (S.D.N.Y.1952), this court defined the appropriate inquiry in much broader terms—i.

e. whether the average consumer would be likely to believe that the infringer's products "had some connection" with those of the registrant, Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 155 (9th Cir., 1963). *See also* Esquire, Inc. v. Esquire Slipper Mfg. Co., 243 F.2d 540 (1st Cir., 1957).

The 1962 amendments to the Lanham Act deleted the requirement that there be confusion "as to the source or origin of the goods or services." Pub.L.No.87-772, § 17, 76 Stat. 773 (1962). While the legislative history does little to clarify the congressional intent, *see, e. g.,* S.Rep.No.2107, 87th Cong., 2d Sess. (1962), the literal language of the current Act is sufficiently broad to unequivocally embrace a cause of action based on confusion as to commercial sponsorship. *See, e. g.,* HMH Publishing Co., Inc. v. Lambert, 482 F.2d 595 (9th Cir., 1973); Smith v. Chanel, Inc., 402 F.2d 562, 563 (9th Cir., 1968). *See also* Communications Satellite Corp. v. Comcet, Inc., 429 F.2d 1245, 1252 (4th Cir., 1970). *But see* Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc., 395 F.2d 457, 462 (3d Cir., 1968).

beam Corp., 183 F.2d 969 (9th Cir., 1950), cert. denied 340 U.S. 920, 71 S.Ct. 357, 95 L.Ed. 665 (1951); Stork Restaurant v. Sahati, 166 F.2d 348 (9th Cir., 1948). The word "playboy" was firmly established in the English language long prior to its use by HMH and has historically carried with it strong connotations of wealth, urbanity and sophistication.[8] As such, it has a natural attraction for any enterprise which caters to the interests of men; and it is not improbable that this fact influenced HMH's adoption of the term for its trademark. However, the mere registration of the word "playboy" as a trademark can not entitle the registrant to capture the entire commercial utility of such a widely known concept.

We share the view that a businessman should not be permitted to

. . . pluck a word with favorable connotations for his goods or services out of the general vocabulary and appropriate it to his exclusive use no matter how much effort and money he may expend in the attempt.

Esquire, Inc. v. Esquire Slipper Manufacturing Co., 243 F.2d 540, 543 (1st Cir., 1957).

■ It is true however, that the expenditure of efforts and money may re-sult in the development of a "secondary meaning" even though the original mark is weak. 3 Callman, Unfair Competition, Trademarks and Monopolies, § 77.1 (3rd ed. 1969). That is, the originally weak mark may come to be associated with the registrant's products to such an extent that the purchasing public generally believes that a product which bears that mark is in some fashion connected with the products of the registrant. Should this occur, the use of such a word or phrase by another can result in a likelihood of confusion. *See, e.g.,* Everest & Jennings, Inc. v. E. & J. Manufacturing Co., 263 F.2d 254 (9th Cir., 1958), cert. denied 360 U.S. 902, 79 S.Ct. 1284, 3 L.Ed.2d 1254 (1959).

HMH asserts that it has established a secondary meaning for its mark "Playboy" in the automotive field. To support this assertion it introduced extensive evidence of its promotional advertising, and resulting commercial success, in marketing its own products.[9] And, more to the point, it also made a showing that emphasized the extent to which automobile manufacturers advertised in *Playboy* magazine and the scope of promotional activities in which HMH's marks have been used to assist the marketing efforts of certain automobile manufacturers.[10]

---

8. Thus, in addition to noting the use of the term as the "title of a popular man's magazine dealing with fashions entertainment, etc. . . . ," Wentworth & Flexner, Dictionary of American Slang 396 (Supp. ed., 1967) defined "playboy" as:

a man of any age who is noted for an ostentatious social life, esp. one who is often seen in public with different women, usu. at expensive places of entertainment. 1931: "Hendrik the playboy" Queen, Dutch Shoe, 104 . . . . *The term always implies wealth, educatoin, social standing, and sophistication.* (emphasis in original).

9. In this regard, the district court found that for many years prior to appellant's first use of the term Playboy, HMH had (a) enjoyed large revenues/profits from the publication of *Playboy* magazine, the operation of Playboy Clubs and the sale of Playboy Club Keys; (b) expended large sums of money to promote the magazine, its clubs and the sale

of its keys; (c) mailed millions of pieces of advertising literature to solicit the purchase of keys; and (d) sold millions of copies of Playboy magazine each month. 342 F.Supp. at 1277–1278.

10. The district court found that HMH had become publicly identified and associated with automobiles and their related products, especially in the area of sports or pleasure vehicles, from the following data:

(a) *Playboy* magazine ran approximately 180 pages of automobile advertising in the years 1960–1967 and derived approximately $4,036,282 [sic] in revenues from such advertising. The automotive advertising run in *Playboy* magazine in said period heavily emphasized sports and pleasure vehicles. As examples, advertisements were run for such vehicles as Austin Healy, M.G. . . . .

(b) Among all American monthly magazines *Playboy* ranked third in the amount of automotive advertising run in 1967.

We accept the proposition that, with respect to the products which it in fact distributes, HMH has been successful in creating a secondary meaning for the term "Playboy." *See, e.g.,* HMH Publishing Co. Inc. v. Turbyfill, 330 F.Supp. 830 (N.D.Fla.1971). However, in so doing we hasten to add that a "large expenditure of money does not of itself create legally protectable rights." Smith v. Chanel, Inc., 402 F.2d 562, 568 (9th Cir., 1968). *See also* Carter-Wallace, Inc. v. Procter & Gamble Co., *supra,* 434 F.2d at 800. Moreover, it must be borne in mind that extensive advertising in and of itself does not assure the existence of a likelihood of confusion. *See* Sears, Roebuck & Co. v. Allstates Trailer Rental, Inc., 188 F. Supp. 170 (D.Md.1960).

These admonitions are particularly appropriate in determining whether HMH's mark has acquired a secondary meaning with respect to automobiles and automotive products. Heavy advertising by automobile manufacturers in *Playboy* magazine standing alone does not establish the likelihood of confusion as to sponsorship. *See, e.g.,* Triangle Publications, Inc. v. Rohrlich, 167 F.2d 969 (2d Cir., 1948), overruled on other grounds, Monsanto Chemical Co. v. Perfect Fit Products Manufacturing Co., 349 F.2d 389 (2d Cir., 1965); Triangle Publications, Inc. v. Standard Plastic Products, 241 F.Supp. 613, 616, (E.D. Pa.1965); Time, Inc. v. Life Television Corp., 123 F.Supp. 470, 478 (D.Minn. 1954); Esquire, Inc. v. Maira, 101 F. Supp. 398, 400–402 (M.D.Pa.1951). *But see* Esquire v. Esquire Slipper Manufacturing Co., *supra* 243 F.2d at 544. While it does tend to indicate that automobile manufacturers believe the readers of *Playboy* to comprise a large segment of the population which is likely to purchase their products, this is not the same as a showing that the public is likely to be confused as to HMH's sponsorship of the automobiles so advertised.

Somewhat more persuasive in establishing a secondary meaning with respect to automobiles and automotive products is HMH's use of its marks in conjunction with promotional activities engaged in by certain automobile manufacturers who have advertised in *Playboy*. These promotional "tie-ins" do tend to create an association between HMH and the products which it actively aids in marketing. However, they do not dictate the resolution of the ultimate issue of this case—*viz.* whether, upon seeing the appellant's products, the public will be likely to assume that they have been endorsed by HMH.

Bearing on the proper resolution of this issue is the fact that there has been no showing of actual confusion on the part of the public. Although such a showing is not necessary, *see, e.g.,* Mershon Co. v. Pachmayr, 220 F.2d 879 (9th Cir., 1955), it would be determinative in many instances. Strongly suggesting no likelihood of confusion with respect to HMH's sponsorship of appellant's activities in upholstering, automotive repairs and service, and automobile towing is the fact that the record contains no indication that HMH has had any connection with these types of businesses. We also must remember that the appellant, in adopting the term "Playboy," neither utilized the same style of print as HMH nor did he use HMH's familiar Rabbit Head logo. *Cf.* HMH Publishing Co. Inc. v. Turbyfill, *supra.*

Were the above considerations the only ones fairly suggested by the record of this case, we would be inclined to hold that HMH had failed to establish a likelihood of confusion as to sponsorship of

---

(c) In addition, prior to September 1967 *Playboy* magazine published numerous articles and other editorial materials related to automobiles. Said articles heavily emphasized sport and pleasure vehicles. 342 F.Supp. 1278–1279. Evidence was also introduced that manufacturers who had advertised in *Playboy* magazine had on occasion hired "Playboy Playmates" or "Playboy Bunnies" to make personal appearances at automobile dealerships in order to promote their products.

either the appellant's dune buggies or his other businesses. Such secondary meaning as exists in the automotive area in our opinion would not be enough to lead to the conclusion that the required likelihood of confusion was present.

 However, the district court found that in adopting the name "Playboy," and using it in conjunction with HMH's mark "Bunny," appellant intended to exploit HMH's goodwill and reputation.[11] As a general rule, the plaintiff in an action for trademark infringement is not required to prove the defendant's intent. However, where such intent has been shown, the "inference of likelihood of confusion is readily drawn," Fleischmann Distilling Corp. v. Maier Brewing Co., *supra*, 314 F.2d at 158, because the alleged infringer has indicated by his actions an expectation that such confusion will indeed be created. *See, e.g.,* National Van Lines v. Dean, 237 F.2d 688, 692 (9th Cir., 1956). In effect, such a finding shifts the burden to the defendant to show that his efforts have proven unsuccessful. My-T-Fine Corp. v. Samuels, 69 F. 2d 76, 77 (2d Cir., 1934). *See also* National Lead Co. v. Wolfe, 223 F.2d 195 (9th Cir., 1955).[12]

 Our review of the record reveals that the district court's findings on the issue of wrongful intent are not clearly erroneous.[13] In view of this finding, and our concomitant inability to find that the appellant has sustained his burden of proving that his efforts to confuse were unsuccessful, we believe the district court was correct in issuing an injunction under the Act. We so hold.

### III.

Were we to have approached this case from the standpoint of the California law of unfair competition, our result would have been the same. Cal.Civil Code § 3369. *See, e.g.,* Schwartz v. Slenderella Systems of California, 43 Cal.2d 107, 271 P.2d 857 (1954); Jackson v. Universal International Pictures, 36 Cal.2d 116, 222 P.2d 433 (1950); Eastern Columbia v. Waldman, 30 Cal.2d 268, 181 P.2d 865 (1947); Academy of Motion Picture Arts and Sciences v. Benson, 15 Cal.2d 685, 104 P.2d 650 (1940); Ball v. American Trial Lawyers' Ass'n, 14 Cal.App.3d 289, 92 Cal. Rptr. 228 (1971); MacSweeney Enterprises, Inc. v. Tarantino, 235 Cal.App.2d 549, 45 Cal.Rptr. 546 (1965); Industrial Photo Service v. Kelly, 198 Cal.App.2d 665, 17 Cal.Rptr. 907 (1961). Although we recognize the possibility that HMH may have more extensive rights under California's antidilution statute, Cal. Bus. & Professions Code § 14330, in the absence of an authoritative pronouncement by the California courts on the scope of this section [14] we offer no comment on its applicability to the facts before us.

11. *See supra* at n. 6.

12. This shifting of the burden has been most succinctly stated in the following fashion:

> But when [the intent to confuse] appears, we think that it has an important procedural result; the late comer who deliberately copies the dress of his competitors already in the field, must at least prove that his effort has been futile. . . . He may indeed succeed in showing that it was; that, however bad his purpose, it will fail in execution; if he does, he will win . . . . But such an intent raises a presumption that customers will be deceived.

My-T-Fine Corp. v. Samuels, *supra* 69 F.2d at 77.

13. It should be noted, however, that the evidence of such intent was somewhat weak. For example, in its findings the district court placed some reliance upon appellant's prior knowledge of *Playboy* magazine and the Playboy Clubs. It is our view that this factor is relevant only in in its negative implications—i. e. where the absence of such knowledge can be shown, the existence of intent is more difficult to establish.

14. The extent to which the inquiry concerning the existence of confusion is either eliminated or reduced in significance by this statute remains unclear. However, there has been some suggestion that the dilution statute is merely a codification of existing law. *See* Ball v. American Trial Lawyers' Ass'n, *supra*.

### IV.

Appellant also attacks that portion of the judgment which awarded HMH reasonable attorneys' fees. Although such an award may have been proper under prior authority, *see, e.g.,* Friend v. H. A. Friend & Co., 416 F.2d 526 (9th Cir. 1969); National Van Lines v. Dean, *supra,* this Court has since reconsidered the issue in Pachmayr Gun Works v. Olin Mathieson Chemical Corp., 502 F.2d 802 (9th Cir., 1974) and concluded that attorney's fees are not recoverable in an action of the type presently before us. Nor do we feel that the facts warrant the application of this Court's historic equity power to make such an award. *See* Maier Brewing Co. v. Fleischmann Distilling Corp., 359 F.2d 156, 164 (9th Cir., 1966) (en banc), aff'd 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). Thus, the award of attorneys' fees must be reversed.

We have examined appellant's other assignments of error, and find them to be without merit. The judgment is, therefore,

Affirmed in part and reversed in part.