NATIONAL FOOTBALL LEAGUE PROP-
ERTIES, INC., a California corporation,
and Seattle Professional Football Club,
a general partnership, doing business as
the "Seattle Seahawks", Plaintiffs,

v.

WICHITA FALLS SPORTSWEAR, INC.,
a Texas Corporation, Defendant.

No. C80–1027C.

United States District Court,
W. D. Washington.

Feb. 9, 1982.

John Paul Reiner, Robert L. Raskopf, Christopher C. Larkins, Townley & Updike, New York City, Stephen A. Smith, Preston, Thorgrimson, Ellis & Holman, Seattle, Wash., for plaintiffs.

B. Michael Schestopol, Oles, Morrison, Rinker, Stanislaw & Ashbaugh, Seattle, Wash., for defendant.

## MEMORANDUM OPINION

COUGHENOUR, District Judge.

### THE PARTIES

Plaintiff National Football League Properties, Inc. (hereinafter referred to as "NFLP") is a California corporation jointly owned by the twenty-eight member clubs of the National Football League (hereinafter referred to as "member clubs"). NFLP is the exclusive licensing agent for the registered and common law marks of the member clubs. Plaintiff Seattle Professional Football Club is a general partnership organized and existing under the laws of the State of Washington. The Seattle Club operates a professional football team known as the "Seattle Seahawks." Defendant Wichita Falls Sportswear, Inc. (hereinafter referred to as "Wichita") is a Texas corporation in the business of manufacturing and selling garments.

The controversy between the parties concerns Wichita's manufacture of "NFL football jersey replicas." An NFL football jersey replica is a football style shirt bearing large numerals, colors corresponding to an NFL team, sleeve design, and either the full team name (i.e., "Seattle Seahawks"), the team nickname (i.e., "Seahawks"), the "home" city name or regional designation of the respective NFL team (i.e., "Seattle") or the name of a team player (i.e., "Jim Zorn").

### JURISDICTION

Plaintiffs seek to enjoin Wichita from manufacturing or selling NFL football jersey replicas. They allege that such activity constitutes: (1) infringement of the federally registered service marks of the member clubs in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) infringement of the common law trademarks of the member clubs; (3) false designation of the origin and sponsorship of Wichita's goods, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (4) unfair competition and misappropriation of the commercial properties of the member clubs, in violation of the common law; (5) infringement of the registered trademarks of the Seattle Club, in violation of RCW § 19.77.140; (6) deceptive business practices, in violation of RCW § 19.86.020; (7) misappropriation of the rights of publicity of the member clubs, in violation of the common law right of publicity; and (8) tortious interference with the business relationships of NFLP, its licensees and the consuming public, in violation of the common law.

Subject matter jurisdiction is asserted under 15 U.S.C. § 1121 by virtue of plaintiffs' § 1114(1) (infringement of a federally registered mark) and § 1125(a) (false designation of origin) claims.[1] The state

---

1. There is some question regarding plaintiffs' claim on the federally registered marks. Registration is prima facie evidence of the registrant's exclusive right to use the registered mark in commerce on the goods or services specified in the registration. 15 U.S.C. § 1115(a). The member clubs have federally registered the full team name (i.e., "Seattle Seahawks") and the team nickname (i.e., "Seahawks") of their respective teams as service

causes of action are properly before the Court under the doctrine of pendent jurisdiction. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## FACTS

NFLP was created by the member clubs of the NFL in 1963. Each member club grants an exclusive license, either directly or through a trust, to NFLP to act as licensing representative for the trademarks and other commercial identifications of the member clubs. NFLP then authorizes manufacturers to produce merchandise bearing the NFL member club's marks. An NFLP licensee is required to pay to NFLP a royalty fee of 6.5% of all net sales of licensed products. Royalties paid by licensees are the sole source of funding for a charitable foundation known as NFL Charities. Since 1971, NFLP has donated almost five million dollars to NFL Charities, including the United Way and the National Negro College Fund.[2]

NFLP conducts a nationwide comprehensive program of trademark protection on behalf of the member clubs. It has investi-

gators in each city with a franchise club to investigate claims of trademark infringement. Complaints are received from a variety of sources, including retailers, licensees and consumers. In every instance, appropriate action to protect the trademarks is taken. The vast majority of these matters are settled amicably. NFLP has, however, gone to court to defend its trademark rights. *See, e.g., National Football League Properties, Inc. v. Consumer Enterprises, Inc.,* 26 Ill.App.3rd 814, 327 N.E.2d 242 (Ill. App.Ct.1975); *National Football League Properties, Inc. v. Dallas Cap & Emblem Mfg., Inc.,* 26 Ill.App.3rd 820, 327 N.E.2d 247 (Ill.App.Ct.1975).

NFLP also maintains a quality control program to monitor the quality and appearance of its licensees' merchandise. This program is in addition to whatever quality control the individual licensees maintain.

■ Wichita was founded by its president Leo Cooke in 1976. It began as a manufacturer of softball uniforms for local area teams. Defendant began the manufacture of NFL football jersey replicas in 1977.[3]

---

marks, and not as trademarks. The services specified in the registration of "Seahawks" is for "Entertainment services in the form of professional football games and exhibitions." Wichita alleges that service mark registration creates no presumption of exclusive use as to the marks on the NFL football jersey replicas. A trademark is any word, name, symbol or device adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others. 15 U.S.C. § 1127. A service mark is a mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others. *Id.* The distinction is between goods and services. As one commentator has explained, "[W]hile a trademark serves to identify and distinguish the source and quality of a tangible product, a service mark functions to identify and distinguish the source and quality of an intangible service." 1 McCarthy, *Trademarks and Unfair Competition,* § 19.29 at 705 (1973) (hereinafter referred to as *"McCarthy"*).

Plaintiffs do not seem to use the marks as service marks with the NFL football jersey replicas. A given symbol may be used in such a way that it functions both as a trademark for goods and as a service mark for services and

would be separately registrable. *See Re American Sav. & Accounting Supply, Inc.,* 172 U.S. P.Q. 406 (TMT & App Bd 1972). The use of a federally registered service mark as a trademark would not, however, give the user federally registered trademark rights. In this case the marks are used as to goods (the NFL football jersey replicas) and not as to services. Moreover, the licensing of shirts seems beyond services included under the specification "entertainment services in the form of professional football games and exhibits." Recognition of any rights via the federally registered service marks would be inappropriate.

The right to relief, whether premised on federal registration, § 43(a) of the Lanham Act or state unfair competition law, is the same. All relief is bottomed on a showing of likelihood of confusion. *See New West Corp. v. NYM of California,* 595 F.2d 1194, 1201 (9th Cir. 1979).

**2.** The Oakland Raiders franchise does not participate in NFL Charities.

**3.** Defendant finds some significance in being the first manufacturer to produce NFL football jersey replicas with the city name/regional designation as the descriptive term. Exact duplication is not a prerequisite to a finding of

NFLP became aware of defendant's activities in 1978. In accordance with its standard procedures, NFLP sent defendant a "cease and desist" letter. The matter seemed to have been resolved amicably in 1979. In the spring of 1980, however, NFLP again received evidence of defendant's allegedly infringing activity. After Wichita declined to cease and desist, plaintiffs commenced the present action.

A preliminary injunction was granted by Judge Rothstein on October 3, 1980. Defendant was enjoined from producing shirts bearing "large numerals and the team colors, stripe configuration, and the team name and/or the 'home' city name or regional designation of the respective Member Clubs." After the decision in *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912 (9th Cir. 1980), *cert. denied*, 452 U.S. 992, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981) (hereinafter referred to as *"Job's Daughters"*), the preliminary injunction was modified on March 13, 1981. In lieu of a full injunction, defendant was ordered to place a disclaimer label on each of its NFL football jersey replicas which read "Not authorized or sponsored by the NFL." Although less restrictive in impact, the order was expanded in scope to include jerseys bearing the name of any player of a member club.

A contempt hearing was held before Judge Rothstein on November 21, 1981. Wichita was found in contempt for selling jerseys with team nicknames before the injunction was modified. Evidence was also introduced of defendant having sold shirts without the proper phrasing of the disclaimer and other potential violations of the order, but were not found contemptuous.

Damages and attorneys' fees resulting from defendant's contemptuous activity were left for this Court to determine.[4]

Plaintiffs seek reinstatement of the original injunction with an inclusion of player names. Defendant responds that it is legally competing in the NFL football jersey replica market and cannot be restrained.

## TRADEMARK INFRINGEMENT—COMMON LAW AND § 43(a)

■ An NFL football jersey replica consists of four separate elements: First, the shirt must bear official team colors of an NFL member club. Second, it must bear a large numeral. Third, an NFL football jersey replica usually has some sleeve design.[5] Finally, it must have a descriptive term which relates the shirt to an NFL team. This term can be an NFL full team name, a team nickname, a city or regional designation or the name of a team player. It is this fourth element, the descriptive term, that the actual controversy is about. Absent this fourth element, the NFLP has disclaimed any interest in the shirts of other manufacturers. The issue then is whether plaintiffs have trademark rights in these descriptive terms when presented with the other three elements or a colorable imitation thereof.[6]

Plaintiffs' federal cause of action is premised on § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The statute provides in part:

> Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, . . . and shall cause such

---

trademark infringement. The test is whether defendant's use of the mark will create a likelihood of confusion.

**4.** The Court's ruling on the contempt matters will follow in a separate opinion.

**5.** The exact sleeve design is not significant. Neither defendant nor plaintiffs' licensees copy the official stripe pattern of an NFL member club. All that is meant here is that an NFL football jersey replica usually has some design on the sleeve. Omitting a sleeve design would

not, however, preclude a finding of trademark infringement. The jersey would still be a colorable imitation of plaintiffs' mark.

**6.** Color, *per se*, is not capable of appropriation as a trademark. *McCarthy*, § 7:16 at 178. Color may be an essential element in an arbitrary arrangement of symbols or words and be protected in that context. *Ives Laboratories, Inc. v. Darby Drug Co.*, 601 F.2d 631 (2nd Cir. 1979).

goods or services to enter into commerce, . . . shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

 In order to sue under the statute, it is not necessary for a mark or trademark to be registered. *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1198 (9th Cir. 1979). Whether the theory is § 43(a) of the Lanham Act or state unfair competition law, the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks. *Id.* at 1201. The burden on plaintiffs is twofold: First, plaintiffs must establish secondary meaning in their use of the descriptive terms in the football context. Second, defendant's activities must be shown to have created a likelihood of confusion.

 To meet their burden, plaintiffs prepared a nationwide probability survey. Since it would be impossible to bring every potentially confused consumer into court and have him or her testify, a survey can be highly probative on the issues of secondary meaning and likelihood of confusion. *See McCarthy*, § 32:46 at 498–500. The survey must, however, have been fairly prepared and its results directed to the relevant issues.

 A suggested list of factors important to an assessment of a survey are set forth in the Handbook of Recommended Procedures for the Trial of Protracted Cases, issued by the Judicial Conference of the United States, 25 F.R.D. 365 (1960). The Judicial Conference recommends that the offeror of any survey have the burden of establishing: First, the proper universe was selected and examined; second, a representative sample was drawn from that universe; third, the mode of questioning

the interviewees was correct; fourth, the persons conducting the survey were recognized experts; fifth, the data gathered were accurately reported; sixth, the sample design, the questionnaire and the interviewing were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; seventh, the sample design and the interviews were conducted independently of the attorneys; and, eighth, the interviewers trained in this field had no knowledge of the litigation or the purposes for which the survey was used.

Defendant did not seek to introduce a survey of its own. Instead, Wichita challenged plaintiffs' survey as to the universe selected, the relevancy of the questions and the potentially slanted formulation of the questions.

 The first step in designing a survey is to determine the relevant "universe." "The universe is that segment of the population whose characteristics are relevant to the mental associations at issue." *McCarthy*, § 32:47 at 500. A survey of the wrong universe is of little probative value. The universe selected by plaintiffs was the entire population of the continental United States between the ages of thirteen and sixty-five.

 Defendant argues that the only relevant universe is likely purchasers of NFL football jersey replicas.[7] Plaintiffs respond, with some authority, that the relevant universe is the entire population.[8] The last word by the Ninth Circuit would indicate the relevant universe is potential purchasers. "In assessing the likelihood of confusion to the public, the standard used by the courts is the *typical buyer* exercising ordinary care." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979) (emphasis

---

7. Purchaser language is often found in trademark infringement cases. *See, e.g., HMH Publishing Co., Inc. v. Brincat*, 504 F.2d 713, 716 (9th Cir. 1974) (consumer language); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 155 (9th Cir. 1962) (average purchaser perspective).

8. There is authority that the Lanham Act was intended to outlaw confusion of any kind, not merely confusion as to purchasers. *See, e.g., Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 568 (2nd Cir. 1971); *Koopers Co. v. Krupp-Koopers GmbH*, 210 U.S. P.Q. 711, 717 (W.D.Pa.1981).

added). The Court does not reach the issue, however, because plaintiffs' survey is separately projectable for the universe defendant claims is legally relevant. Separate data is available for prior purchasers of NFL football jersey replicas, "fans"[9] and "fans plus"[10] of NFL member clubs. Even defendant's own expert conceded that these groupings were likely potential purchasers of the NFL football jersey replicas. Moreover, even assuming the relevant universe is potential purchasers, the response of the entire population is of some relevance absent a showing that potential purchasers would have a significantly different response to the survey.

In general, the Court is impressed with the steps plaintiffs took to insure the reliability of the survey. It was well-designed, meticulously executed and involved some of the best experts available. The Court was not persuaded by defendant's efforts to challenge plaintiffs' survey. In view of the fact that defendant offered no survey data of its own, plaintiffs' survey results were essentially uncontroverted.

## SECONDARY MEANING

 Secondary meaning has been defined as association, nothing more. *Carter-Wallace, Inc. v. Proctor & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970). The basic element of secondary meaning is a mental recognition in buyers' and potential buyers' minds that products connected with the symbol or device emanate from or are associated with the same source. *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 200 U.S.P.Q. 713, 716 (9th Cir. 1980). The public does not have to know the specific corporate identity of the single source as long as the public associates the product bearing the mark with a single, though anonymous source. *See Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *McCarthy*, § 15:2 at 520.

In order to establish secondary meaning, plaintiffs' survey was directed toward answering this question: When presented with football replica jerseys do people associate such jerseys with the National Football League or its franchised team? The data indicates a significantly high association in the public's mind between the jerseys and the NFL or member clubs. The association level varied from 55–80% depending upon the descriptive term employed (nickname, city name or player name).

The level of association between the shirt and the NFL is not surprising. Evidence was introduced that the descriptive terms are often used in the parlance to refer to specific NFL member clubs. More significantly, Wichita's own pleadings admit that it designed its jerseys to capitalize on the market of those people who want to associate themselves with an NFL team. In its motion for partial summary judgment, defendant wrote, "The good will and popularity generated by the NFL throuh [sic] the marketing of its successful entertainment services ... has had the side effect of creating a substantial market for items an NFL fan or other consumer would wish to have in order to identify with the NFL or one of its member clubs" and "Wichita Falls has a right to compete in the NFL football jersey replica market ...." Defendant concedes in his trial brief that "[i]t is beyond question that consumers purchase NFL football jersey replicas in order to associate themselves with NFL member clubs."

Defendant argues, however, that the relevant inquiry for secondary meaning in this context is not whether the public associates the products bearing the marks in question with the NFL or a member club but whether the mark primarily denotes to the consumer that the jersey replica was produced, sponsored or endorsed by the NFL member club. That is, because plaintiffs do not

---

**9.** "Fans" are defined as people who report themselves as fans of professional football.

**10.** "Fans plus" were individuals who not only reported themselves as fans of professional football but also had the shirt of their favorite team available among their set of test shirts.

manufacture the products in question (but, instead, license the right to manufacture the jerseys with the marks to a number of producers), there is no single though anonymous source of the product.

 Trademark law does not just protect the producers of products. The creation of confusion as to sponsorship of products is also actionable. *See HMH Publishing Co., Inc. v. Brincat*, 504 F.2d 713, 716 (9th Cir. 1974); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2nd Cir. 1979). The standard, however, applied by the courts in determining whether a showing of secondary meaning has been made in a sponsorship context is not well-defined. *See, e.g., HMH Publishing*, 504 F.2d at 718 (secondary meaning is demonstrated by a showing that the purchasing public generally believes that a product which bears that mark is "in some fashion connected" with the products of the registrant); *Wyatt Earp Enterprises, Inc. v. Sackman, Inc.*, 157 F.Supp. 621, 625 (S.D.N.Y.1958) (collapsing the analysis of likelihood of confusion and secondary meaning).

 The correct standard should be reachable deductively. There is a symmetry between the concepts of secondary meaning and likelihood of confusion. Secondary meaning requires an examination of the non-infringing party's mark and product, and tests the connection in the buyers' mind between the product bearing the mark and its source. Likelihood of confusion in a sponsorship context focuses on the product bearing the allegedly infringing marks and asks whether the public believes the product bearing the marks originates with or is somehow endorsed or authorized by the plaintiff. *See Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 388–90 (5th Cir. 1977); *Supreme Assembly, Order of Rainbow, for Girls v. J. H. Jewelry Co.*, F.Supp. (N.D.Tex.1981). Just as the relevant inquiry for the establishment of likelihood of confusion in a

sponsorship context is the belief that sponsorship or authorization was granted, the inquiry should be the same in order to establish secondary meaning.[11]

Plaintiffs' survey has data directed toward the inquiry above. One question in the survey asked people who had only seen "official" jerseys (that is, exact copies of jerseys plaintiffs' licensees sell) whether they thought the company that had made the jersey had "to get authorization or sponsorship, that is permission, to make it?" If the interviewee responded that authorization was required, he was asked from whom was the authorization obtained.

Of the interviewees who were exposed to the official NFL football jersey replica, 45.3% of the general public who saw jerseys with a city name/regional designation descriptive term, 55.5% of those who saw the player name and 44.8% of the interviewees who saw the team name on the shirt, believed that the manufacturer was required to obtain authorization from the NFL or one of the member clubs in order to manufacture the jerseys. The overall belief level was around 50%. For those interviewees within the class of potential purchasers (prior purchasers, fans and fans plus) the belief levels were even higher.

 After considering the survey results, the testimony of the witnesses and the other evidence presented, the Court is satisfied that plaintiffs have made a sufficient showing of secondary meaning in their marks.

## LIKELIHOOD OF CONFUSION

 Likelihood of confusion is the keystone to any trademark infringement action. Despite the levels of secondary meaning established, absent a showing of likelihood of confusion there is no actionable wrong. The stronger the evidence of secondary meaning, however, the stronger the mark and the more likely is confusion.

---

**11.** At least one other court reached the conclusion that secondary meaning in a sponsorship context requires a showing that the public believes that the product bearing the mark is sponsored or endorsed by plaintiff. *See Ideal Toy Corp. v. Kenner Products Division of General Mills Fun Group, Inc.*, 443 F.Supp. 291 (S.D.N.Y.1977).

*Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 200 U.S.P.Q. 713, 717 (9th Cir. 1980).

Likelihood of confusion as interpreted by the Ninth Circuit is a conclusion reached after applying a multi-factor analysis.

In order to determine whether there is a likelihood of confusion in a trademark infringement case, the Court must consider numerous factors, including *inter alia* the strength or weakness of the marks, similarity in appearance, sound, and meaning, the class of goods in question, the marketing channels, evidence of actual confusion, and evidence of the intention of defendant in selecting and using the alleged infringing [mark].

*J. B. Williams Co. v. Le Conte Cosmetics, Inc.,* 523 F.2d 187, 191 (9th Cir. 1975), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1975). *See AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir. 1979).

 A strong mark is inherently distinctive and will be afforded the widest ambit of protection from infringing uses. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 349 (9th Cir. 1979). The more arbitrary and fanciful the mark, the more distinctive. Focusing on the descriptive terms in a football context, the team nicknames seem extremely fanciful. Why one team is a bear and another a lion is anyone's guess. As for the city name/regional designations, these marks are inherently non-distinctive as they describe the geographic location of the team. By establishing secondary meaning in the city names/regional designations in a football context, plaintiffs nonetheless may be entitled to trademark protection. *See Norm Thompson Outfitters, Inc. v. General Motors Corp.,* 448 F.2d 1293, 1296 (9th Cir. 1971). A similar showing of secondary meaning was made for player names. Moreover, even if plaintiffs' marks

are "weak," they still would be entitled to limited protection. Plaintiffs do not seek a monopoly over the word "Seattle," for example, but only use of the term as it relates to NFL football jersey replicas. *See New West Corp. v. NYM Co. of California,* 595 F.2d 1194, 1202 (9th Cir. 1975).

The Court is struck with the physical similarity between the "official" NFL football jersey replicas and Wichita's product. There is some variation in design and striping and color, but the differences are not significant. Indeed, Wichita's product, when considered with the testimony of defendant's witnesses, is a calculated effort to create distinctions in the products which will have no real meaning in the minds of consumers. Moreover, the strong correlation in survey data between those responding to questions after having seen the "official" jerseys and those answering after having seen the defendant's product, supports the conclusion of similarity.

The class of goods of the product are the same. Both are NFL football jersey replicas. Moreover, the marketing channels are, for the most part, similar. Plaintiffs' licensees and defendant sell to major department stores. Defendant claims to do more business in the small "mom and pop" stores than plaintiffs.[12] Plaintiffs also offer products bearing their marks through catalogs, which defendant does not.

 The next factor in the likelihood of confusion analysis is evidence of actual confusion. Actual confusion is not a necessary finding in order to establish likelihood of confusion. *See Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 159 (9th Cir. 1963). Evidence that defendant's use has already led to confusion is a persuasive factor, however, that future confusion is likely. *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 352 (9th Cir. 1979).

12. In a filing with the Securities and Exchange Commission regarding its distribution, Wichita wrote:

The Company distributes the shirts in Specialty Shops and Department Stores. The Company presently has the shirts in stores in all parts of the nation. It ships all products

F.O.B. Wichita Falls, Texas, to stores such as: Macy's, Montgomery Wards, Bloomingdales, Maas Bros., Foley's, Joskes, Sheplers, Nordstroms, Goldwaters, Castner-Knotts, Strawbridge, Boscovs, and many others. No single customer accounts for more than 10% of the Company's sales.

The evidence of actual confusion concerns the testimony of a retail purchaser of defendant's products and the survey itself. The purchaser assumed defendant's product (shirts bearing the word "Chargers" on them) were licensed. In the survey, interviewees confronted with identical copies of defendant's jersey were asked if they felt authorization was required in order to manufacture the jersey. Depending on the descriptive term employed on the jersey, 41.8% of the general public who saw shirts with the city name/regional designation, 53.6% of the interviewees who were shown jerseys with a player's name on the front and 47.8% of those shown shirts with the team nickname felt that authorization from the NFL or the member club was required. The results were higher for people in the potential purchaser category.

 The final factor is the intent of the defendant. Although a plaintiff need not prove that defendant intended to exploit the good will and reputation associated with a mark, where such intent is shown, the inference of likelihood of confusion is readily drawn. *HMH Publishing Co. v. Brincat*, 504 F.2d 713, 720 (9th Cir. 1974). There is some authority that a showing of intent shifts the burden to the defendant to prove that his efforts have been unsuccessful. *Id. See, e.g., My-T-Fine Corp. v. Samuels*, 69 F.2d 76, 79 (2nd Cir. 1934); *Levi Strauss & Co. v. Blue Bell, Inc.*, 200 U.S. P.Q. 434, 445 (N.D.Cal.1978).

The Court finds that defendant intended to create confusion as to authorization or sponsorship. Several factors are relevant in the Court's determination of intent. Wichita's overall conduct in these proceedings has been questionable at best. Judge Rothstein found defendant in contempt of the preliminary injunction by its continued sales of jerseys with team nicknames. Even though defendant "knew" it was not allowed to sell the jerseys, it continued to do so. More illuminating was Wichita's activities with regard to the disclaimer requirement of the modified injunction. Judge Rothstein ordered defendant to place the phrase "Not authorized or sponsored by the NFL" on the label of any jersey manufactured or sold by Wichita. In compliance with this order, defendant had some of the disclaimers placed on the back of labels where they would not be seen by consumers. Others were designed so that the disclaimer would lie well under the throat of the jersey, hidden from the eye of consumers. On another batch of jerseys defendant, without Court approval, modified the phrasing of the disclaimers. In the Court's mind, defendant's conduct is evidence of its intent to place the disclaimers where they could not be seen or understood. This is direct evidence of defendant's intent to create confusion as to sponsorship since the very purpose of the disclaimers was to rectify any sponsorship confusion.

An important factor in the Court's determination of intent was the demeanor of the witnesses for the defendant. The Court had the opportunity to listen to Wichita's president, Leo Cooke, on the stand. At one point he testified that Wichita did not intend to sell Los Angeles Rams shirts when it sold jerseys bearing the word "Rams" to the Los Angeles area. These shirts were allegedly meant for Irvine High School students. The unfortunate fact, however, was that the nickname for Irvine High School was not the "Rams" but "Vacaros." At another point in his testimony Mr. Cooke stated that many of the shirts sold were not intended to be NFL football jersey replicas, but were intended to service high schools which incidentally shared a nickname with an NFL member club. Again, problems arose as the evidence indicated that the large bulk of these orders were in infant and toddler sizes. Mr. Cooke then suggested that the toddler and infant sizes may have been for the children of the high school students.

Finally, there is the general intent of the defendant. There is no question that Wichita intended to manufacture its products to resemble NFL football jersey replicas. Mr. Cooke testified that he sold shirts with city names and team nicknames to NFL fans who wished to support a particular member club. Moreover, defendant continued to

manufacture its product after being informed by NFLP that such conduct was, in their view, infringing activity. Defendant intended to appropriate the good will and reputation of the NFL. This reflects on Wichita's intent to confuse the public as to sponsorship.

■ After considering the overall conduct of the defendant, its specific conduct with regard to the disclaimers, and the demeanor of its witnesses, the Court finds that Wichita intended to create confusion as to authorization or sponsorship. Defendant has offered no evidence that its use of the mark on its jerseys was not likely to create confusion as to sponsorship or authorization. This finding of intent to deceive is not, however, essential to the Court's decision. Even without this factor, plaintiffs have established likelihood of confusion.

Plaintiffs have demonstrated that a substantial number of the public at large and of the consuming public for NFL football jersey replicas are likely to be confused by defendant's product.[13] Defendant's activities infringe on plaintiffs' rights as trademark owners to "prevent consumer confusion as to who produced the goods and to facilitate differentiation of the trademark owner's goods." *Job's Daughters*, 633 F.2d 912, 919 (9th Cir. 1980).

### BARS TO RECOVERY

Defendant asserts three "defenses" to the charge of trademark infringement. First, Wichita argues that the marks are functional and therefore not subject to trademark status. Second, granting plaintiffs trademark rights is said to constitute a product monopoly in violation of the doctrine of *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964) (hereinafter referred to as "*Sears-Compco*"). Finally, the marks are claimed to be generic.

■ Trademark law does not prevent a person from copying the functional features of a product. *Job's Daughters*, 633 F.2d 912, 917 (9th Cir. 1980). Functional features constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored or endorsed a product. *Id.* Functionality is not, however, limited to tangible items which "work" (such as a chair or a doorknob) but includes features which are aesthetically pleasing.

The Ninth Circuit case of *Pagliero v. Wallace China Co.*, 198 F.2d 339 (9th Cir. 1952), well illustrates the concept of aesthetic functionality. The issue in *Pagliero* was whether defendant's copying of plaintiff's floral pattern design for china constituted trademark infringement. The Court found no trademark infringement because the design served primarily as a functional part of the product:

> If the particular feature is an important ingredient in the commercial success of the product, the interest in free competition permits imitation in the absence of a patent or copyright. On the other hand, where the feature or, more aptly, design, is a mere arbitrary embellishment, a form of dress for goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer demands in connection with the product, imitation may be forbidden....

198 F.2d at 343.

Wichita asserts that the descriptive terms in the context of an NFL football jersey replica are crucial ingredients in the commercial success of plaintiff's licensing program. In other words, no consumer who wishes to purchase an NFL football jersey replica would buy a jersey unless it has the descriptive term which relates the jersey to a member club. An attractive feature is not *per se* functional. *See Keene Corp. v. Paraflex Industries, Inc.*, 653 F.2d 822, 825

---

**13.** Confusion levels of this degree have been found significant by other courts. *See, e.g., James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266 (7th Cir. 1976) (15% confu-

sion level); *Helene Curtis Industries v. Church & Dwight Co.*, 560 F.2d 1325 (7th Cir. 1977), cert. denied, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1977) (29%).

(3rd Cir. 1981) (finding it anomalous that the more attractive the mark, the less protection and thus creating a disincentive for development of imaginative and attractive design). The feature must be "that aspect of [the] product which satisfies [the] consumers' tastes for beauty." *Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 774 (9th Cir. 1981) (refusing to find functionality as a matter of law simply because a feature is attractive).

■ Even assuming the marks are functional does not, however, preclude trademark protection. A functional feature may additionally serve as a trademark and be protected as such. As the Court stated in *Job's Daughters*:

> Our holding does not mean that a name or emblem could not serve simultaneously as a functional component of a product and a trademark. That is, even if the Job's Daughters' name and emblem, when inscribed on Lindeburg's jewelry, served primarily a functional purpose, it is possible that they could serve secondarily as trademarks if the typical customer not only purchased the jewelry for its intrinsic functional use and aesthetic appeal but also inferred from the insignia that the jewelry was produced, sponsored or endorsed by Job's Daughters.

633 F.2d at 919. It is exactly this showing of trademark significance that plaintiffs made in their demonstration of secondary meaning and likelihood of confusion.

■ Defendant's next argument is that trademark protection would constitute an impermissible product monopoly under the doctrine of *Sears-Compco*. Assuming the applicability of *Sears-Compco* to plaintiffs' cause of action,[14] Wichita's argument misses the point. *Sears-Compco* concerned the prohibition of copying a *product* not protected by a federal patent or copyright. Plaintiffs do not seek to prohibit the manufacture of jerseys, only jerseys which bear their marks. The jerseys are the product

and not the marks. "[I]t is clear that *Sears-Compco* did not redefine the permissible scope of the law of trademarks insofar as it applies to origin and sponsorship." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204 (2nd Cir. 1979).

Trademarks always grant "product monopolies" in that they allow exclusive use of features which connote origin or sponsorship. Adopting Wichita's definition of "product" would subsume all trademark law.

■ Defendant's final defense is the genericness doctrine. In other words, defendant contends that the marks are generic for NFL football jersey replicas. "The genericness doctrine in trademark law is designed to prevent ... anti-competitive misuse of trademarks. At its simplest, the doctrine states that when a trademark primarily denotes a product, not the product's producer, the trademark is lost." *Anti-Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 301 (9th Cir. 1979). A generic mark no longer serves a trademark function. Considering plaintiffs' establishment of secondary meaning and likelihood of confusion, the Court finds that the primary significance of the marks is source identification. Defendant is a trademark infringer of plaintiffs' marks and has violated § 43(a) of the Lanham Act.

The Court finds it unnecessary to reach plaintiffs' other causes of action.

### REMEDY

The final inquiry is the appropriate remedy to be selected. Beyond compensation for actual damages caused by Wichita's activities (which is to be heard later in a bifurcated trial), plaintiffs seek full injunctive relief. Defendant obviously prefers no sanctions be imposed, but if a remedy is to be given, it would prefer the disclaimer requirement set forth in the modified preliminary injunction.

---

14. The applicability of *Sears-Compco* to a § 43(a) cause of action is not clear. *See Ives Laboratories, Inc. v. Darby Drug Co.*, 601 F.2d 631 (2nd Cir. 1979); *Truck Equipment Service* *Co. v. Fruehauf Corp.*, 536 F.2d 1210 (8th Cir. 1976), *cert. denied*, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).

An injunction is the standard remedy in unfair competition cases. *McCarthy*, § 30:2 at 329. Injunctions for trademark infringement are well-recognized by this circuit. *See, e.g., Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 200 U.S.P.Q. 713 (9th Cir. 1980) (enjoining Blue Bell from using Levi's distinctive pocket tab); *HMH Publishing Co., Inc. v. Brincat*, 504 F.2d 713 (9th Cir. 1974) (enjoining defendant from use of the name "Playboy" in connection with defendant's various businesses). The scope of the injunction may vary, depending on the need and equities of the parties. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) (limited injunctive relief considering defendant's longstanding use of the mark). "[T]he scope of the injunction to be entered depends upon the manner in which plaintiff is harmed, the possible means by which that precise harm can be avoided, the viability of the defenses raised, and the relative inconvenience that would be caused to defendant by each of the several means of avoidance." *McCarthy*, § 30:2 at 329.

The scope of the injunction in this case has been influenced by the relative equities between the parties and the efficacy of less extensive relief. Plaintiffs have fairly represented themselves in this matter. Their claim has not been overbroad nor their demands excessive. The Court is mindful of the fact that the funds collected by NFLP from its licensing program are used for charitable purposes.

The conduct of defendant, on the other hand, has been far from laudable. Wichita was openly contemptuous of Judge Rothstein's preliminary injunction. Defendant sold a significant number of jerseys in direct violation of the order. Even when defendant had obtained a modified injunction, its conduct, perhaps within the strict letter of the injunction, was violative of the intent of the order. The disclaimers used by defendant were small, often incorrectly phrased, sometimes placed on the back of a label and generally situated in such a way that they could not be seen by the consumer. More significantly, the testimony of defendant's president, Leo Cooke, at times strained credulity.

Defendant has shown itself unwilling to comply with the order of the Court in the past. Anything less than a full injunction would provide Wichita an opportunity to circumvent the order. This is not a case of someone legitimately trying to compete in the jersey market, but of an entity calculatedly operating to deceive. Whether a less extensive injunction, such as the disclaimer requirement, would be appropriate for a more meritorious defendant is not properly before the Court.

The Court concludes that the scope of the injunction must include not only jerseys in the full official colors of an NFL member club but also jerseys which use the dominant team color of an NFL member club. A jersey with the dominant team color is substantially similar to one with the full official colors and would be likely to confuse. There is no evidence, however, that use of a nondominant team color on the jersey would create a likelihood of confusion.

The injunction should also permit Wichita to use team colors and certain descriptive terms for non-NFL football jersey replicas. In other words, throughout the country there are non-NFL teams and organizations such as high schools, colleges and Pop Warner leagues (hereinafter referred to as "non-NFL entities") which share a nickname with an NFL member club and have either the full team colors or the dominant team color of such NFL member club. Defendant should be able to service these non-NFL entities. Direct sales to these organizations or to stores (within a limited geographic area) which service these organizations are permitted. Wichita has the option, moreover, to differentiate its non-NFL entity jerseys from NFL football jersey replicas by placing the name or designation of the non-NFL entity on the jersey in sufficient size and proximity that it may be seen and understood.

Pursuant to the above stated reasons, defendant's use of the marks is found to create a likelihood of confusion and to violate

§ 43(a) of the Lanham Act. Plaintiffs are entitled to full injunctive relief. The injunction, as well as findings of fact and conclusions of law, accompany this memorandum opinion. Should this opinion contain findings of fact or conclusions of law not separately set forth in the appropriate section, they shall be treated as so set forth and are to be incorporated therein.