```
THIS OPINION IS
A PRECEDENT OF
THE TTAB
```

Mailed: March 13, 2007

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Nike, Inc.
(substituted for Official Starter LLC)[1]
v.
WNBA Enterprises, LLC

_____

Opposition No. 91160755
Opposition No. 91160763

_____

Donald F. Frei and Sarah Otte Graber of Wood Herron & Evans LLP for Nike, Inc.

Anil V. George of NBA Properties, Inc. for WNBA Enterprises, LLC.

_____

Before Holtzman, Drost and Cataldo, Administrative Trademark Judges.

Opinion by Holtzman, Administrative Trademark Judge:

Applicant, WNBA Enterprises, LLC, has filed two applications to register the mark shown below.

---

[1] The Board on August 23, 2005 granted opposer's motion to substitute Nike, Inc. as plaintiff herein.

Application Serial No.78246426 is for the following goods in

Class 18:

> Athletic bags, shoe bags for travel, overnight bags, umbrellas, backpacks, baby backpacks, duffel bags, tote bags, luggage, luggage tags, patio umbrellas, valises, attache cases, billfolds, wallets, briefcases, canes, business card cases, book bags, all purpose sports bags, golf umbrellas, gym bags, purses, coin purses, fanny packs, waist packs, cosmetic cases sold empty, garment bags for travel, handbags, key cases, knapsacks, suitcases, toiletry cases sold empty, trunks for traveling and rucksacks.

Application Serial No. 78246393 is for the following goods in

Class 25:

> Clothing, namely hosiery, footwear, basketball shoes, basketball sneakers, T-shirts, shirts, sweatshirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, caps, warm-up suits, warm-up pants, warm-up tops, jackets, wind resistant jackets, parkas, coats, cloth baby bibs, head bands, wrist bands, aprons, boxer shorts, slacks, caps, ear muffs, gloves, mittens, scarves, woven and knit shirts, dresses, cheerleading dresses and uniforms.

Both applications were filed on May 6, 2003 based on an allegation of a bona fide intention to use the mark in commerce.

Opposer filed a notice of opposition against each application,[2] asserting as its ground for opposition, priority and likelihood of confusion under Section 2(d) of the Trademark Act.[3]  In particular, opposer alleges prior use and ownership of

---

[2] Opposition No. 91160755 was filed on May 21, 2004 against Serial No. 78246426; Opposition No. 91160763 was filed on May 24, 2004 against Serial No. 78246393.  The oppositions were consolidated by the Board on August 23, 2005.

[3] Opposer also alleges dilution as a ground for opposition.  Inasmuch as opposer submitted no evidence or argument on this claim, the claim will be given no further consideration.

at least 15 registrations of marks that consist of or comprise an S and star design, principally the following two marks,

 

for goods described by opposer as "clothing, clothing accessories, headwear, footwear, back packs, athletic bags, stationery items, sports bottles, sporting equipment, and related goods and services," including Registration No. 1210630 for the mark ![S and star] for "adult and youth wearing apparel, namely, jackets and warm-up suits" in Class 25.

Opposer also asserts ownership of at least 15 pending applications that consist of or comprise the S and star design, including application Serial No. 74468405 for the mark ![STARTER] for "luggage, namely, back packs, knapsacks, all purpose sports bags, gym and novelty tote bags" in Class 18.

Opposer claims that applicant's mark, when applied to applicant's goods, so resembles opposer's previously used and registered family of S and star design marks as to be likely to cause confusion.

Applicant, by its answers, admits opposer's "ownership and status" of its pleaded Registration No. 1210630 and application Serial No. 74468405. Applicant also admits that opposer is the owner of the other registrations and applications pleaded by opposer; and that all the pleaded applications (except pleaded application Serial No. 78380777) were filed prior to the filing

3

date of the opposed application.  Applicant has denied the remaining salient allegations.

The record includes the pleadings; the files of the involved applications; and, by stipulation of the parties, testimony in the form of declarations submitted by both parties.  Opposer submitted the testimony and "supplemental" testimony, with exhibits, of Elizabeth Kain, contract manager of Exeter Brands Group, LLC, which manages the licensing and marketing of opposer's trademarks; and the testimony, with exhibits, of Sarah Otte Graber, counsel for Official Starter LLC.  In addition, opposer filed a notice of reliance on status and title copies of a number of its pleaded registrations; TESS and TARR copies of certain pleaded applications; and applicant's responses to opposer's discovery requests.[4]

Applicant submitted the testimony of Emilio Collins, vice president, global marketing partnerships of NBA Properties, Inc.; the testimony, with exhibits, of Carolanne McAuliffe, director, WNBA Marketing Partnerships; and the testimony, with exhibits, of Anil V. George, intellectual property counsel at NBA Properties, Inc.

Both parties filed briefs and opposer filed a reply brief.

---

[4] We note that Ms. Kain did not reference any exhibits in the testimony itself, but instead simply attached a listing of over 100 exhibits to the end of her declaration.  Ms. Kain should have at least provided some explanatory cross-reference of the exhibits to the relevant testimony.  Opposer introduced the documents in response to discovery requests under Trademark Rule 2.120(j)(3)(i) in the same manner, making

## The Parties

Applicant, WNBA Enterprises, LLC, owns the intellectual property of the WNBA, a professional women's basketball league affiliated with the NBA.  The WNBA is composed of 14 teams, including the San Antonio Silver Stars.  Applicant's mark is one of the trademarks of the San Antonio Silver Stars team.  The WNBA games are played in WNBA arenas in metropolitan markets including Madison Square Garden in New York; the Target Center in Minneapolis, Minnesota; and the SBC Center in San Antonio, Texas.

Opposer manufactures and sells a variety of men's, women's and children's sports-related clothing, such as jerseys, outerwear and headwear; and sports-related goods such as basketballs, baseballs, sports bags and backpacks.  Opposer, through its predecessors, has been using marks that consist of or comprise the S and star logo with clothing and sports bags since 1980.[5]  The marks are used by placing them directly on the goods, on hang tags and labels associated with the goods, and on packaging for the goods.

Opposer sells its merchandise under its private brand, and is also licensed to co-brand its merchandise with the names and logos of sports leagues and teams.  Opposer has established marketing relationships with professional sports leagues, such as

---

it difficult to determine which documents were responsive to which discovery requests.

[5] Ms. Kain refers to these marks as a group identifying them as "Starter's S☆ marks."  There is no testimony relating to any individual mark.

the National Football League (NFL), the National Hockey League (NHL), Major League Baseball (MLB) and the National Basketball Association (NBA); as well as collegiate basketball teams in the National Collegiate Athletic Association (NCAA).  In addition, opposer provided official athletic gear, including sports bags, duffle bags and clothing for the 1996 U.S. Olympic team.

Opposer has been licensed to manufacture and market products bearing the names and logos of the NBA and certain individual teams since 1981.  In particular, the marks have been used and promoted in connection with clothing, sporting goods and bags of the NBA team the "San Antonio Spurs," located in San Antonio, Texas.  Opposer has also promoted its sports-related products in association with NCAA collegiate basketball teams located in Texas.

Opposer promotes and advertises its marks and goods through product catalogs; through advertisements in sports-related magazines, such as Sports Illustrated, NBA HOOP, and Vibe, and non-sports magazines such as Complex; through endorsements by prominent professional athletes, including NBA players; and on banners displayed during professional sports games.  In 2005, opposer contracted to have large banners "showing the Starter S☆ Mark" displayed at courtside in 11 stadiums where NBA basketball teams play, including the "Target Center" arena, located in Minneapolis, Minnesota; and in 16 stadiums at courtside where NCAA basketball teams play.  (Kain Decl., ¶¶ 10, 14.)

6

Opposer sells its products in general retail stores, in sporting goods stores such as Foot Locker and Champs Sports, and on the websites of K-Mart, Wal-Mart and www.gifts.com.

Applicant is involved with creating and marketing logos for the WNBA teams, including the San Antonio Silver Stars, for consumer merchandise.  The WNBA has established a merchandising program around the trademarks of its teams, and uses the marks on consumer products including apparel, bags and carrying cases. The WNBA has product and "sponsorship partner relationships" with such companies as Nike, Reebok, Russell Athletic, Nokia and Coca Cola, which advertise their products in conjunction with the WNBA and WNBA team logos.  (Collins Decl., ¶5.)  The "sponsorship" relationships include advertising, cross-promotional activities and specific WNBA team sponsorships.

Each WNBA team logo is part of a larger merchandise marketing plan that creates and promotes an overall team "identity."  (McAuliffe Decl., ¶4.)  Applicant's S and star design mark is part of a category of WNBA team identities known as secondary team logos.  The secondary team logos are used to "complement" the primary team logos which incorporate a team name or nickname along with the team's geographic indicator.  The primary logo of the San Antonio Silver Stars is shown below.



Although the subject applications were filed on an intent-to-use basis, applicant started using the mark in May 2003 on clothing.  Products bearing this team logo, as is customary with WNBA consumer products in general, simultaneously depict one or more WNBA league logos on hangtags or stickers associated with the goods.

The WNBA has an active and loyal fan base with more than 28 million adult fans.  During the 2004 season, over 2 million spectators attended WNBA games for the sixth consecutive year.  The WNBA games are televised on networks, including ABC, ESPN, and ESPN2.  Since 1997, the WNBA has operated a league website located at www.wnba.com with an online store and information about the WNBA players and the league.  The website received 79.6 million page views in 2004, and receives about 900,000 unique visitors per month.

**PRIORITY**

Opposer, by its notice of reliance, has made of record status and title copies of certain of its pleaded registrations for the marks consisting of or comprising the logo.[6]

_____

[6] We note, however, that the copy of Registration No. 2179091 shows the status of that registration as "cancelled," and therefore this registration has not been considered.  We also note that the status and title copies of two registrations, Registration Nos. 2200628 and 2209298, do not reflect that Section 8 affidavits, while due before the April 27, 2005 date of preparation of the status and title copies by the Office, were filed by opposer, and Office records now show that these registrations were cancelled on July 30, 2005 and September 11, 2005, respectively.  It appears that the status and title copies were prepared by the Office after the expiration of the grace period for filing the affidavits, but before the time for automatic cancellation of the registrations had passed.  When a Federal registration owned by

8

The mark  is the subject of the following registrations:

Registration No. 1210630 for "adult and youth wearing apparel-namely, jackets and warm-up suits" in Class 25;

Registration No. 1614937 for "adult and youth wearing apparel, namely, jackets, warmup shirts and suits, wind resistant jackets, sweatshirts and suits, t-shirts, head bands, wrist bands, shorts, polo shirts, sweaters, tank tops and hats" in Class 25; and

Registration No. 2772524 for "gloves" in Class 25.

That mark is also the subject of Registration No. 2553955 for "sport bottles sold empty" in Class 21; and Registration No. 2851159 for goods in Class 28 including pumps for inflating sports equipment, basketball nets, baseball batting gloves, and baseball catcher shin guards.[7]

The mark  is the subject of the following registrations:

---

a party has been properly made of record, and the status of the registration changes between the time it was made of record and the time the case is decided, the Board will take judicial notice of the current status of the registration, as shown by the records of the Office. See TBMP §704.03(b)(1(A) (2d ed. rev. 2004). Accordingly, the cancelled registrations have not been considered.

We also note that the status and title copies of the registrations show ownership in Official Starter LLC. Ms. Kain testified that on May 31, 2005, which was subsequent to the date of preparation of these records, Official Starter LLC assigned its rights in the marks to Nike, Inc. We take judicial notice that Office records have now been updated to reflect ownership of the registrations in the name of Nike, Inc.

[7] Neither this registration, nor Registration Nos. 2134015 and 2209298, discussed infra, were pleaded by opposer in the notice of opposition. However, applicant has not objected to opposer's reliance on the three unpleaded registrations. Accordingly, we treat these unpleaded registrations as having been tried by implied consent of the parties

Registration No. 1478788 for "adult and youth wearing apparel, namely-jackets, warm up suits, wind resistant jackets, sweat suits, t-shirts, head bands, wrist bands, shorts, polo shirts, sweaters, tank tops, undershirts and hats" in Class 25;

Registration No. 2772525 for "gloves" in Class 25; and

Registration No. 2247531 for "clothing for infants and toddlers, namely French creepers, one piece jumpers, rompers, coveralls, pants, shirts, sleepers, headbands and bonnets" in Class 25.

Additional registrations made of record by opposer for the mark are as follows: Registration No. 2105473 for "basketballs, footballs, soccer balls, flying discs, golf bags, golf balls, golf club head covers, baseball batting gloves, baseballs and volleyballs" in Class 28; Registration No. 2847787 for goods in Class 28 including pumps for inflating sports equipment, basketball nets, baseball batting gloves, and baseball catcher shin guards; Registration No. 2134015 for goods in Class 16 including pens, pencils and stationery; Registration No. 2179091 for goods in Class 16 including binder sets and composition books; Registration No. 2070084 for "wrist watches" in Class 14; Registration No. 2553954 for "sport bottles sold empty" in Class 21; Registration No. 2556281 for "eyeglasses, sunglassses and eye-glass cases" in Class 9; and Registration No.

and we deem opposer's pleading amended to assert the registrations under Fed. R. Civ. P. 15(b).

2209298 for "retail store services in the field of apparel and accessories" in Class 42.

Thus, opposer's standing has been established, and its priority with respect to the registered marks for the goods and/or services identified therein is not in issue.[8] King Candy Co., Inc. v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

Opposer has also demonstrated priority based on use of the mark on apparel, and use of the mark on sports bags prior to the May 6, 2003 constructive date of first use of the subject applications.[9] Ms. Kain states in her declaration that opposer has used "Starter's S☆ marks" with clothing and sports bags since at least as early as 1980. (Decl., ¶7.) Opposer has submitted photographs and catalogs showing use of one or both versions of the mark on various items of sports-related

---

[8] Opposer submitted TESS and TARR records of certain of its pleaded applications with its notice of reliance. The Office records now show that all of those applications, except Serial No. 74468405 for STARTER S and design for "luggage; namely, back packs, knapsacks, all purpose sport bags, duffel bags, gym and novelty tote bags" in Class 18 and Serial No. 74428320 for RUGGED TERRAIN S STARTER and design for wearing apparel in Class 25, have been abandoned. In any event, pending applications are evidence only that the applications were filed on a certain date. They are not evidence of use of the marks. See Viking Boat Co. v. Viking Camper Supply, Inc., 191 USPQ 297 (TTAB 1976). Further, applicant's admissions in its answers of opposer's ownership of the pleaded applications and opposer's "ownership and status" of application Serial No. 74468405 are not admissions that the marks in the applications are in use.

[9] Office records indicate that opposer's application Serial No. 74468405 for the STARTER S and star design mark in Class 18 matured into Registration No. 3036990 on January 3, 2006, after the close of opposer's testimony period on September 30, 2005.

11

clothing and on hangtags for the clothing; and use of the STARTER
S and star design mark on sports bags, such as backpacks and gym
bags.[10]

Priority having been established, we turn to the question of
likelihood of confusion.

**LIKELIHOOD OF CONFUSION**

Our determination under Section 2(d) is based on an analysis
of all of the probative facts in evidence that are relevant to
the factors bearing on the likelihood of confusion issue.  In re
E.I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA
1973).  In any likelihood of confusion analysis, however, two key
considerations are the similarities or dissimilarities between
the marks and the similarities or dissimilarities between the
goods.  See Federated Foods, Inc. v. Fort Howard Paper Co., 544
F.2d 1098, 192 USPQ 24 (CCPA 1976).

**Family of marks**

Opposer has pleaded and argues in general terms that it owns
a family of "S and star design" marks for a variety of sports-
related products.  In addition to its two principal S and star
design marks, opposer contends that it has also used other marks
incorporating the S and star design, such as STARTER TEAM WEAR
DREAM WEAR STARTER S and star design; IT STARTS WITH THE RIGHT
ATTITUTDE STARTER S and star design; and STARTER ALL-AMERICAN

---

[10] There is no evidence by opposer or any admission by applicant that
opposer has used the mark S and star design alone on bags.

12

TEEN S and star design.  However, the requisite showing of a family of marks has not been made.  The fact that opposer may have used and/or registered several marks incorporating this feature, is not in itself sufficient to establish the existence of a family of marks.  See J & J Snack Foods Corp. v. McDonald's Corp., 932 F.2d 1460, 18 USPQ2d 1889 (Fed. Cir. 1991).  As stated by the Court "There must be a recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods."  J & J Snack Foods, supra at 1891.  Accordingly, opposer must demonstrate that the marks asserted to comprise the family, or a number of them, have been used and advertised in promotional material or in everyday sales activities in such a manner as to create common exposure and thereafter recognition of common ownership based upon a feature common to each mark.  See Truescents LLC v. Ride Skin Care LLC, 81 USPQ2d 1334 (TTAB 2006) citing American Standard, Inc. v. Scott & Fetzer Co., 200 USPQ 457, 461 (TTAB 1978).

We have insufficient evidence that opposer has promoted any number of its claimed marks together to the public.  Opposer's evidence consists largely of either internal documents or marketing materials, such as product catalogs and promotional brochures, directed to merchandisers.  None of this material is evidence of public exposure to the marks, or in any event, of the extent of public exposure to such marks.  In fact, there is little or no evidence of actual use of any "S and star design"

13

marks together other than the S and star design alone and the S and star design with the word STARTER. Even then, the two marks appear together for the most part only on clothing, and not on a variety of sports-related products.[11]

In any event, the existence of a family of marks would not necessarily enhance opposer's claim of likelihood of confusion in this case because applicant is seeking registration for the exact feature that opposer claims is the basis of its family of marks claim without any additional word or design elements, and opposer owns registrations for the claimed family feature itself.

Therefore, we will determine the issue of likelihood of confusion based on the individual marks that are the subject of opposer's registrations and/or for which opposer has established prior use. In our analysis we will focus on the marks of opposer which can be considered closest to applicant's mark and goods, namely the mark in Registration Nos. 1210630 for "adult and youth wearing apparel-namely, jackets and warm-up suits" in Class 25; 1614937 for "adult and youth wearing apparel, namely, jackets, warmup shirts and suits, wind resistant jackets, sweatshirts and suits, t-shirts, head bands, wrist bands, shorts, polo shirts, sweaters, tank tops and hats" in

---

[11] Opposer refers generally to its claimed "star system" marketing strategy which includes the mark "LOOK FOR THE STAR," and that slogan can be seen on hangtags in photographs of clothing and in a photograph of a basketball. However, opposer has not explained this strategy in any detail and its impact, if any, on consumers cannot be determined. Further, the claimed family feature is the S and star design, not the "star" feature alone.

14

Class 25; and 2772524 for "gloves" in Class 25; and opposer's

previously used mark for sports bags.

## Goods

### Serial No. 78246393 (Class 25)

The goods in this application are identified as follows:

Clothing, namely hosiery, footwear, basketball shoes, basketball sneakers, T-shirts, shirts, sweatshirts, sweatpants, pants, tank tops, jerseys, shorts, pajamas, sport shirts, rugby shirts, sweaters, belts, ties, nightshirts, hats, caps, warm-up suits, warm-up pants, warm-up tops, jackets, wind resistant jackets, parkas, coats, cloth baby bibs, head bands, wrist bands, aprons, boxer shorts, slacks, caps, ear muffs, gloves, mittens, scarves, woven and knit shirts, dresses, cheerleading dresses and uniforms.

The apparel identified in opposer's Registration Nos. 1210630, 1614937 and 2772524 is identical in part to the apparel identified in applicant's '393 application. The overlapping goods include, for example, t-shirts, sweatshirts, sweatpants, tank tops, sweaters, hats, warm-up tops, jackets, wind resistant jackets, head bands, wrist bands, boxer shorts, slacks and gloves.

### Serial No. 78246426 (Class 18)

The goods in applicant's '426 application are identified as follows:

Athletic bags, shoe bags for travel, overnight bags, umbrellas, backpacks, baby backpacks, duffel bags, tote bags, luggage, luggage tags, patio umbrellas, valises, attache cases, billfolds, wallets, briefcases, canes, business card cases, book bags, all purpose sports bags,

golf umbrellas, gym bags, purses, coin purses, fanny packs, waist packs, cosmetic cases sold empty, garment bags for travel, handbags, key cases, knapsacks, suitcases, toiletry cases sold empty, trunks for traveling and rucksacks.

These goods are identical in part to opposer's sports bags which include backpacks and gym bags. Furthermore, the clothing identified in opposer's registrations is closely related to the Class 18 goods in applicant's '426 application. Wearing apparel is complementary in nature to accessories for clothing such as purses and tote bags, and items which are used to transport clothing or carry personal articles such as backpacks, duffel bags and garment bags. Applicant itself offers or intends to offer both types of products under its S and star design mark and the evidence shows that opposer markets both types of products under a variation of its S and star design mark. In this regard we also consider under the tenth du Pont factor, "the variety of goods on which a mark is or is not used (house mark, 'family' mark, product mark)." Although opposer has not established a family of marks, opposer has used and registered the S and star design, with or without the word STARTER, for apparel and sports apparel as well as for other sports-related products and equipment. Such products include basketballs, footballs and baseballs, pumps for inflating sports equipment, sunglasses, batting gloves, shin guards, and sports bottles. The fact that opposer applies its marks to a variety of sports products makes it more likely that purchasers, aware of opposer's use of the

mark on a variety of sports products, when seeing a similar mark used in connection with backpacks, duffel bags and other sports bags, are likely to believe that these products are also being produced or sponsored by opposer. See Genesco Inc. v. Martz, 66 USPQ2d 1260, 1271 (TTAB 2003) ("this factor may favor a finding that confusion is likely even if the goods are not obviously related"). Thus, this factor, as well as the relatedness of apparel and bags, would favor opposer. See Uncle Ben's Inc. v. Stubenberg International Inc., 47 USPQ2d 1310 (TTAB 1998).

### Channels of trade

Absent any restrictions in the respective applications and registrations, we must presume that applicant's apparel and bags and opposer's apparel are sold through all normal channels of trade for those goods, including all the usual retail outlets. See Canadian Imperial Bank v. Wells Fargo, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1987). Opposer's evidence shows that the normal channels of trade for these products, as well as opposer's sports bags, include general retail stores, sporting goods stores such as Foot Locker and Champs Sports, and online retail outlets such as the websites for K-Mart and Wal-Mart. In addition, applicant states that it intends to sell its goods through all the normal channels of trade including traditional retailers and sporting goods stores. (Resp. to Interrog. No. 15.)

### Purchasers/cost

17

Applicant does not dispute that the respective goods are identical and/or closely related or that the channels of trade for the goods would be the same. Applicant's arguments concern the purchasers for these goods.

Applicant argues that the sophistication of sports consumers precludes the likelihood of confusion. Applicant contends that its products are primarily purchased by, or for, fans of the WNBA and each of its teams. According to Ms. McAuliffe and Mr. Collins, sports fans are very discerning and specific in their loyalties to individual teams; they are accustomed to seeing banners and other marketing materials of third-party sponsors in and around the basketball arenas where WNBA teams play; and they will not be confused into thinking that the sponsor's products are licensed WNBA products. Mr. Collins states that NBA and WNBA fans are well-acquainted with the concept of sports marketing; that they understand the role of sponsorships in the sports world; and that fans are aware that a "sponsorship relationship" does not function as a source identifier with the league or team with which the sponsorship exists.

Opposer, for its part, contends that the typical consumers of opposer's goods are men, women, boys and girls interested in sports in general and in association with professional sports leagues and teams. According to Ms. Kain, the consumers for opposer's products, although interested in their particular

18

teams, are typically not sophisticated buyers but rather buy on a whim or without much deliberation.

The problem with both opposer's and applicant's arguments is that they fail to consider that the goods as identified in applicant's involved applications for apparel and bags, and opposer's registrations for apparel are not restricted to a particular class of purchasers, i.e., sports fans. Furthermore, for the most part the identified goods are not even restricted to sports-related use. It is well settled that the determination of likelihood of confusion must be based on a comparison of the goods as identified in the applications and registrations, rather than on the basis of what evidence might show the actual nature of the goods or actual purchasers of the goods to be. See J & J Snack Foods Corp., supra; and Octocom Systems Inc. v. Houston Computers Services Inc., 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990).

Thus, applicant's and opposer's presumptions about who the relevant purchasers for these goods are or what they would know or think when confronted with the respective marks on the goods described in the applications and registrations are not relevant. It must instead be presumed that while sports fans may be among the purchasers of these goods, in the absence of any specific restrictions in the applications or registrations as to the classes of purchasers, we must presume that both applicant's

19

apparel and bags, and opposer's apparel reach all the usual classes of purchasers, including ordinary consumers.

In any event, ordinary consumers would also be considered potential purchasers of the parties' sports-related clothing, such as warm-up tops and pants, and their sports-related bags, such as gym bags and "all purpose sports bags."

Further, the record shows that both parties' goods are relatively inexpensive. Ms. Kain states that opposer's clothing and bags range from $15-$100, "depending on the nature of the goods." Ms. Kain later states, and the website printouts from www.walmart.com show, that opposer's clothing ranges in price from $5 to $40.[12] Applicant's website shows shirts priced from $20 to $60. It is unlikely that these products would be purchased with the exercise of a great deal of care. See, e.g., Specialty Brands, Inc. v. Coffee Bean Distributors, Inc., 748 F.2d 669, 223 USPQ 1281 (Fed. Cir. 1984) (purchasers of relatively inexpensive products are held to a lesser standard of purchasing care.)

We also note that the WNBA has "sponsorship partner relationships" with companies including Nike, opposer herein. We find that such a relationship, if anything, would enhance the likelihood that even more discerning consumers (assuming, as applicant claims, that sports fans are more discerning) would be

---

[12] From what we can glean from the record, the price difference may depend at least in part on whether the products are branded only with its own marks or are co-branded with team names and logos.

confused as to sponsorship if applicant were to market its goods with a mark similar to the marks of opposer.[13]  See, e.g., Carlisle Chemical Works, Inc. v. Hardman & Holden Ltd., 434 F.2d 1403, 168 USPQ 110, 112 (CCPA 1970) ("Human memories even of discriminating purchasers...are not infallible.").

**Fame**

Thus, we turn to a discussion of the marks, and first to the factor of fame because this factor "plays a 'dominant role' in the process of balancing the du Pont factors."  Recot Inc. v. Becton, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000).  We find that the evidence is not sufficient on this record to prove that opposer's S and star design is a famous mark.  See Blue Man Productions Inc. v. Tarmann, 75 USPQ2d 1811, 1819 (TTAB 2005) ("it is the duty of a plaintiff asserting that its mark is famous to clearly prove it.").

Ms. Kain testified that opposer has used the marks consisting of or comprising the S and star design for over 20

---

[13] Applicant has cited several cases, including Boston Professional Hockey Association v. Dallas Cap & Emblem Manufacturing Co., 510 F.2d 1004, 185 USPQ 364 (5th Cir. 1975), cert. denied, 423 U.S. 868 (1975) and National Football League v. Wichita Falls Sportswear 532 F.Supp. 651, 215 USPQ 175 (W.D. Wash. 1982), in support of its arguments regarding a claimed "association in the minds of consumers between team-branded products and services, on the one hand, and nationally recognized sports teams or professional sports leagues, on the other." First, as we noted, the goods in this case, as identified, are not limited to purchase by sports fans.  Further, while the courts in the cited cases found generally that sports fans are motivated to purchase products bearing the logos of their favorite teams, the courts made no pronouncements about the discerning nature of such purchasers, or any special ability to distinguish trademarks.  In fact, each of the cited cases found a likelihood of confusion as to authorization or sponsorship.

years.  She has provided sales figures for the years 2000-2005 for apparel, footwear, headwear and bags at the wholesale level ranging from $125 million in 2000 to $289 million in 2004, and then dropping to $109 million in 2005.  Ms. Kain explains that the wholesale figures "translate to be double when the goods are sold at retail."  (Supp. Decl., ¶3).  The sales figures appear in the abstract to be substantial.  However, we cannot determine the significance of these figures in a vacuum, and opposer has not provided a meaningful context for them, such as evidence of opposer's market share for the goods.  As stated by the Federal Circuit, "[r]aw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, but raw numbers alone in today's world may be misleading... .  Consequently, some context in which to place raw statistics is reasonable."  Bose Corp. v. QSC Audio Prods., 293 F.3d 1367, 63 USPQ2d 1303, 1309 (Fed. Cir. 2002).  See also Fossil Inc. v. Fossil Group, 49 USPQ2d 1451, 1457 (TTAB 1998); and General Mills Inc. v. Health Valley Foods, 24 USPQ2d 1270 (TTAB 1992).

Further, sales figures, in and of themselves, while perhaps demonstrating the popularity of a product do not necessarily reflect awareness or recognition of the mark applied to the product.  See, e.g., In re Bongrain International (American) Corp., 894 F.2d 1316, 13 USPQ2d 1727 (Fed. Cir. 1990).  For example, there is no breakdown in sales between those products offered solely under opposer's S and star design marks and those

products which are co-branded with league and team logos. Consumers' motivation to purchase opposer's products may be attributed to their recognition of sports team logos rather than any recognition of opposer's S and star design marks.

Opposer's additional evidence is not much more revealing. Ms. Kain testified as to advertising and promotional expenditures for only a two-year period, stating that opposer spent over $7.5 million in marketing and promoting the marks in 2001, and $10 million in 2002 in marketing in association with the NBA and NCAA. In addition, because all of opposer's catalogs (including the catalog relating to the 1996 Olympics) and most of its promotional materials are directed to merchandisers, it is unclear whether a substantial portion of those amounts was spent on promotion to consumers. Nor, in any event, do we have any evidence of the extent to which these materials have been distributed to the trade.

Opposer has introduced numerous internal documents, including marketing recaps, plans and strategies, a "board meeting presentation," a sponsorship and promotional agreement, and an annual report, none of which is probative evidence of consumer exposure to or awareness of the mark. We also point out that while these materials are accepted as true and accurate copies of opposer's authentic business documents they are of record only for what they show on their face, at least to the

extent that there is no testimony concerning the truth or accuracy of the information contained in those documents.[14]

While endorsements of products by famous athletes can no doubt increase brand awareness, opposer has not indicated the frequency or duration of any such promotions.[15] Nor has opposer provided information regarding banner advertising for more than a single year. We cannot determine from opposer's vague and general statements regarding its asserted "star system" program what, if any, impact this program has had on consumers.

Finally, while Ms. Kain states that opposer's goods are currently being sold in general retail stores and on the websites of K-Mart, Wal-Mart and www.gifts.com, we have no evidence of the number of stores (other than in Texas) in which the products are currently sold or the length of time the products have been sold on these websites.

---

[14] As a result of the manner in which the documentary exhibits were introduced in connection with Ms. Kain's testimony, we cannot clearly determine, with respect to many of the exhibits, which documents relate to which testimony.

[15] Opposer's examples of magazine advertisements are of little probative value in this regard. The advertisement featuring Shaquille O'Neal (exhibit 28) is an endorsement of products offered under the STARTER mark, not the S and star design mark. The remaining advertisements (exhibits 28-33) are photographs of unidentified models wearing opposer's apparel, and in any event do not appear to be endorsements by any recognized athletes. There is an example of what Ms. Kain identifies simply as "a promotional brochure" (exhibit 50) dated 1993, and the portion of record consists of three pages featuring Karl Malone. This brochure, like all the other catalogs and brochures of record, appears to have been directed to wholesalers, and there is no indication that it was distributed to the public.

Opposer may have established successful relationships with sports leagues and teams over the years but the extent to which ultimate consumers have been exposed to or are aware of opposer's S and star design mark, on this record, is simply not clear.

Accordingly, the evidence falls short of establishing fame. Nevertheless, we find that the evidence is sufficient to show that opposer's S and star design mark has achieved at least some degree of recognition and strength in the market and that the mark is therefore entitled to a broader scope of protection than might be accorded a less distinctive mark. Further, as will be discussed below, while star designs in and of themselves may be weak, there is no evidence which would effectively diminish the scope of protection to be accorded opposer's S and star design mark as a whole.

### Marks

In determining the similarity or dissimilarity of marks, we must consider the marks in their entireties in terms of sound, appearance, meaning and commercial impression. See du Pont, supra. See also Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005).

We turn first to a comparison of opposer's mark as shown in Registration Nos. 1210630, 1614937 and 2772524 for apparel, with applicant's mark for identical apparel and closely related bags.

25

As to sound, applicant essentially argues, relying on Diamond Alkali Co. v. Dundee Cement Co., 343 F.2d 781, 145 USPQ 211 (CCPA 1969), that the letter in the marks will not be pronounced. Applicant contends that "because the marks are comprised of a common letter and geometric shape, consumers must look to the particular stylization of the lettering and the overall appearance of the composite marks" to distinguish source.

The Federal Circuit has observed in In re Electrolyte Laboratories, Inc., 913 F.2d 930, 16 USPQ2d 1239, 1240 (Fed. Cir. 1990), that "the nature of stylized letter marks is that they partake of both visual and oral indicia." However, it is also true that, as stated by the Board in Textron Inc. v. Maquinas Agricolas "Jacto" S.A., 215 USPQ 162 (TTAB 1982), "when letter marks are presented in a highly stylized form, so that they are essentially design marks incapable of being pronounced or conveying any inherent meaning, then differences in the lettering style and design may be sufficient to prevent a likelihood of confusion. In these cases similarity of appearance is usually controlling and the decision will turn primarily on the basis of the visual similarity of the marks."

While the marks in this case both include a stylized letter S, the letters are not so highly stylized that the marks as a whole would be perceived as purely visual designs. The Diamond Alkali case cited by applicant involved the following two marks,

26

(applicant's mark) and (opposer's mark), both asserted to be a stylized letter D. The Court noted the Board's observation that opposer's mark "would normally be regarded as consisting of an arbitrary design which is capable of many different interpretations rather than as a letter 'd'", and concluded that "symbols of this kind do not sound." Diamond Alkali at 213.

That is not the situation we have here. In the present case, the letter itself is still an essential feature of each mark. The stylization of the letter is not so extreme or striking that when viewing the marks in their entireties, the stylization overwhelms the underlying letter making it virtually unrecognizable or subordinate to the overall design. See, e.g., In re Fisher Tool Co., Inc., 224 USPQ 796 (TTAB 1984) and Textron Inc. v. Maquinas Agricolas "Jacto" S.A., supra. In fact, the stylization itself is not particularly distinctive or unusual and in both marks is easily recognizable as the letter "S."

Thus, the question of similarity or dissimilarity does not turn in this case only on a visual comparison of the marks. We find that the letter "S" in these marks is capable of being spoken and, to that extent, the marks would sound the same when spoken and they would have the same letter mark meaning.

27

Applicant also argues that the marks are different in appearance and create different commercial impressions, enumerating the differences as follows:

> The Starter mark ..... is a simple, flat design without dimension which contains a rigid, hard-edged, geometric "S" in both, the shape of which is formed out of the negative shape of the star. The left side of the Starter Mark's star does not contain a border while the remainder of the star has a dark border traced around the outside of the star. The left side of the Starter Mark's star also has closed tips, while the right side of the star has tips that are unclosed or chopped. The Starter Mark is an interlocking design, the shapes of which are dependent on one another, such that if one were to take away the star portion of the mark, the "s" would cease to exist.
>
> In contrast, the Silver Stars Mark .... ...contains a highly stylized, fluid "S" design absent from any hard curves or edges, which floats in the middle of a dimensional angled star, giving a sense of movement and energy to the design. The star in the Silver Stars Mark star is essentially bilateral; unlike the star in the Starter Mark, every side of the Silver Stars Mark's star has a border and every side of the star has closed tips. Moreover, the Silver Stars Mark is actually a double or concentric star, that is, a star within a star, in contrast to the single star in the Starter Mark.

We find that the marks are similar in appearance and that they create the same overall commercial impression and that the differences in stylization and placement of the two elements are not as important as the overall visual similarities in the marks. The marks contain the same two elements - the letter "S" and a five-pointed star design. In both marks the two elements are equal in size and in relative proportion to each other. Although the letter "S" precedes the star in opposer's mark and appears on

28

top of the star in applicant's mark, the S is physically connected to the star in both marks and it creates the first and most significant visual impact in both marks.

Applicant has made very fine distinctions between the marks and we do not find them either individually or cumulatively significant. It is well settled that marks must be compared in their entireties, not dissected into component parts and the minute details of each part compared with other parts. See Dan Robbins & Associates, Inc. v. Questor Corporation, 599 F.2d 1009, 202 USPQ 100 (CCPA 1979). In the normal marketing environment, purchasers would not usually have the luxury of examining marks in such minute detail. We must also consider that the average purchaser is not infallible in his recollection of trademarks and often retains only a general, rather than a specific, recollection of marks that he may previously have seen in the marketplace. In re Mucky Duck Mustard Co., 6 USPQ2d 1467 (TTAB 1988). Keeping in mind that the marks may not even be seen at the same time, ordinary purchasers who are familiar with opposer's S and star design mark on clothing, upon later encountering applicant's mark on identical and/or closely related clothing and bags, would not necessarily remember fine details about the mark they had previously seen, given their hazy and imperfect recall, and they may remember the marks as being the same. Even those purchasers who notice and remember the differences in the marks, or who are, as applicant claims,

knowledgeable about "sponsorship activities," are likely to believe in view of the overall similarities in the marks that opposer is licensing a slightly different version of the same mark and mistakenly assume that applicant's brand of clothing and bags is therefore sponsored by opposer.[16]

Applicant argues that opposer's mark is weak and not entitled to protection beyond "the exact iteration for which it has a registration."  In support of its position, applicant has introduced a number of third-party registrations and applications, including two registrations and an application which are apparently owned by applicant.  Applicant contends that opposer's mark coexists on the Principal Register with similar marks for similar goods which, according to applicant, reflects a crowded marketplace of S and star design marks.  The registrations and applications are set forth in the chart below.

| | | |
|---|---|---|
| | Reg. No. 2007273 issued to The Baseball Club of Seattle, L.P. | Clothing, namely, shirts, caps, shorts, t-shirts, etc. |
| | Reg. No. 2978808 issued to WNBA Enterprises, LLC | Clothing, namely hosiery, footwear, basketball shoes, t-shirts, etc. |

---

[16] Contrary to applicant's apparent contention, Section 2(d) of the Trademark Act protects not only against confusion as to source, but also as to affiliation, connection or sponsorship.  See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §23:8 (4th ed. 2006).  See also Hilson Research Inc. v. Society for Human Resource Management, 27 USPQ2d 1423 (TTAB 1993); and American Stock Exchange, Inc. v. American Express Co., 207 USPQ 356 (TTAB 1980).

| | | |
|---|---|---|
| | Reg. No. 2756590 issued to WNBA Enterprises, LLC | Clothing, namely, hosiery, footwear, t-shirts, etc. |
| | Reg. No. 2624045 issued to Southern Sun | Shirts, pants, hats and jackets |
| | Reg. No. 2940851 issued to James David Turman | Clothing, namely, coats, jackets, shirts, etc. |
| | Reg. No. 2819782 issued to Chrishell (Partnership) | Clothing, namely, t-shirts, shorts, sweatpants, sweat shirts, etc. |
| | Ser. No. 78486926 filed by Stelari, LLC | Handbags and straps for handbags |
| | Ser. No. 78249556 filed by WNBA Enterprises, LLC | Athletic bags, backpacks, duffel bags, tote bags, luggage, etc. |
| | Ser. No. 78724960 filed by The Baseball Club of Seattle, L.P. | Athletic bags, backpacks, duffel bags, tote bags, etc. |
| | Ser. No. 76648484 filed by Weefeet Company | Clothing, namely, socks, shirts, shorts, sweatshirts and t-shirts |

Evidence of widespread third-party use can serve to diminish the strength of a mark and thus the scope of protection to which a mark is entitled. However, third-party registrations are not

31

evidence of use.[17]  The existence of these marks on the register is not evidence of what happens in the marketplace or that customers are familiar with them.  AMF Incorporated v. American Leisure Products, Inc., 177 USPQ 268, 269 (CCPA 1973) ("little weight is to be given such registrations in evaluating whether there is likelihood of confusion.").  Moreover, pending applications are not evidence of anything except that the applications were filed on a certain date.

Furthermore, the appearance and/or commercial impressions of the marks in these registrations and applications differ markedly from the appearance and/or commercial impression of opposer's mark.  The star is not a prominent feature of the mark in Ser. No. 78486926; and it forms part of a composite suggesting a weather vane in Ser. No. 76648484.  The multiple stars within the S design in Reg. No. 2624045 create a ribbon effect, certainly not present in opposer's mark.  The remaining marks do not contain a geometric star design at all.  The mark in Reg. Nos. 2978808 and 2756590, and Ser. No. 78249556 features a sun design; the mark in Ser. No. 78724960 and Reg. No. 2007273 contains the more complex compass star design; the mark in Reg. No. 2819782 suggests a setting sun or rising star; and the mark in Reg. No. 2940851, if anything, resembles a pinwheel.  Simply put, none of

---

[17] The Section 7(b) presumptions accorded a registration on the Principal Register, including the presumption of use of the mark, accrue only to the benefit of the owner of the registration, and thus only come into play in an inter partes proceeding when the registration is made of record by its owner.  See TBMP §704.03(b)(1)(B).

the marks in these registrations and applications is as similar to opposer's mark as applicant's mark.

In addition, Ms. Kain testified that she is not aware of any unaddressed third-party uses of and/or registrations or applications for similar S and star designs marks for apparel and bags or other sports-related goods. Opposer has submitted evidence of its efforts to police its mark against other entities using what opposer believes to be conflicting S and star marks by cease and desist letters and/or by instituting proceedings against such entities. These matters have either been resolved in opposer's favor or are being pursued by opposer.

In further support of applicant's contention that the mark is weak, applicant argues that the mark is comprised of common elements, a five-pointed star and the letter "S," neither of which, according to applicant, is inherently distinctive. In support of this contention, applicant relies on Philip Morris Incorporated v. Rothmans of Pall Mall Limited, 180 USPQ 592 (TTAB 1973) holding that star designs, like other common geometric shapes, are not distinctive.

It is true that cases have held that star designs are not particularly distinctive, in and of themselves. Opposer's own record shows that star designs in various forms are commonly used on apparel and accessories by sports teams in their logos (for example, the Dallas Cowboys, Houston Astros and Orlando Magic).

33

However, opposer's mark in this case is not a star design alone. It is a composite consisting of a letter and star design. There is no evidence that the letter "S" is commonly used in the sports field or on clothing and bags generally, and certainly no evidence of widespread use. Nor has applicant pointed to any authority stating that a letter mark in and of itself is not distinctive.

In a further attempt to distinguish the marks, applicant argues that opposer's mark is usually used and registered with the word STARTER and that applicant's mark, which is a "secondary" logo, is marketed in connection with its "primary" logo for the San Antonio Silver Stars team. This argument is not relevant. The word STARTER is not part of this registered mark of opposer's, and the "primary" logo is not part of applicant's mark.

We turn then to a comparison of opposer's mark in application Serial No. 74468405 for bags, where STARTER is part of the mark, with applicant's mark for identical goods, keeping in mind that when goods are identical, "the degree of similarity necessary to support a conclusion of likely confusion declines." Shen Manufacturing Co., Inc. v. The Ritz Hotel Limited, 393 F.3d 1238, 73 USPQ2d 1350, 1354 (Fed. Cir. 2004).

For the reasons stated above and the additional reasons which follow, we find, notwithstanding the addition of the word

34

STARTER to opposer's mark, that the overall similarities between the respective marks outweigh their differences.

It has been held that the addition of a trade name or house mark or other such matter to one of two otherwise similar marks will not serve to avoid a likelihood of confusion.  See, e.g., First International Services Corp. v. Chuckles Inc., 5 USPQ2d 1628 (TTAB 1988); In re The U.S. Shoe Corp., 229 USPQ 707 (TTAB 1985); and In re Apparel Ventures, Inc., 229 USPQ 225 (TTAB 1986).  We believe that principle is applicable here.  The S and star design, which is applicant's entire mark, is still a significant component of opposer's composite mark and it creates a strong visual impact apart from the word STARTER.  Further, while the star component of opposer's mark may be weak, there is no evidence that the unitary S and star design as a whole is weak and entitled to only a narrow scope of protection, and certainly not so narrow that it should only extend, as applicant claims, to an "exact iteration" of opposer's mark.  In fact, as we found earlier, opposer's S and star design mark as a whole has achieved a greater degree of distinctiveness than might be accorded a star mark in general and it is therefore entitled to a broader scope of protection.  Thus, while the word STARTER obviously adds to the differences in the marks, it is not sufficient to distinguish the marks when viewed in their entireties.  Compare Knight Textile Corp. v. Jones Investment Co., 75 USPQ2d 1313 (TTAB 2005).  We find that purchasers who are familiar with opposer's

sports bags sold under its S STARTER and star design mark would be likely to believe, upon encountering a mark that consists entirely of a similar S and star design for the identical goods, that the goods originated with or are associated with or sponsored by the same entity.

### Actual confusion

Applicant argues that the parties' marks have coexisted in the marketplace for nearly three years without confusion and that the absence of actual confusion is a critical factor weighing against a finding of likelihood of confusion. Applicant points to a number of cases, including Oreck Corporation v. U.S. Floor Systems, Inc., 803 F.2d 166, 231 USPQ 634 (5th Cir. 1986) and Keebler Company v. Rovira Biscuit Corporation, 624 F.2d 366, 207 USPQ 465 (1st Cir. 1980), finding no likelihood of confusion where the evidence of actual confusion was lacking and where the time period of concurrent use was even shorter than three years.

Suffice it to say that the facts in the cases cited by applicant differ substantially from the facts herein and do not compel a finding in this case or in any given case that a three-year period of contemporaneous use without confusion is per se significant. The lack of actual confusion is only one of a number of factors to be considered in determining likelihood of confusion and in this case we find that it is outweighed by all the other factors in opposer's favor. In fact, the evidence in this case is not sufficient to show that a meaningful opportunity

36

for actual confusion has existed.  In addition to the relatively brief period of contemporaneous use, and notwithstanding that WNBA games in general may receive wide public exposure and attention, there is no specific evidence regarding the nature and extent of public exposure to this particular mark during the period of contemporaneous use.

We find, in view of the similarity of the marks, and because the marks are used in connection with identical and/or closely related goods that are sold in the same channels of trade to the same ultimate consumers, that confusion is likely.

To the extent that there is any doubt on the issue of likelihood of confusion, it is settled that such doubt must be resolved in favor of the prior user and/or registrant. Broderick & Bascom Rope Co. v. The Goodyear Tire and Rubber Co., 531 F.2d 1068, 189 USPQ 412 (CCPA 1976); and Crown Radio Corp. v. Soundscriber Corp., 506 F.2d 1392, 184 USPQ 221 (CCPA 1974).

**Decision:**  The consolidated oppositions are sustained, and registration to applicant is refused.